"(a) In any criminal prosecution brought by the United States or by the District of Columbia * * *".

 It is clear that this criminal prosecution was brought by neither of the two governments mentioned in the statute. The U. S. Attorney urges, that though the statute appears to be restricted to the United States and the District of Columbia prosecutions on its face, a prosecution by the Government of the Virgin Islands is still included within its terms, citing in support of this contention Government of Virgin Islands v. Lovell, 378 F.2d 799 (3 Cir. 1967). In *Lovell,* the Court of Appeals held, in construing the so-called Jencks Statute, 18 U.S.C. Sec. 3500, that, though that statute also read in pertinent part,

"in any criminal prosecution brought by the United States * * *", that court, by virtue of its supervisory powers would make applicable to prosecution in the Virgin Islands the provisions of the Jencks case and statute. This the Court did, because, as it said,

" * * * we believe that the legislative gloss placed on the Jencks case by Congress in enacting 18 U.S.C. § 3500 has resulted in a sound rule. Policy and logic dictate that such a rule shall obtain in all criminal prosecutions in the Virgin Islands * * ".

It follows, of course, that, by virtue of the same supervisory powers the Court of Appeals may make applicable to prosecutions in the Virgin Islands the provisions of 18 U.S.C. § 3501. Thus far, however, the Court has not had the opportunity to act in this regard and, one way or another, this Court, therefore, must, and as best it can, anticipate whether the Circuit Court would in this instance exercise, or decline to exercise, its supervisory powers. Having in mind that court's constant and jealous concern for the rights of persons accused of crime, who are interrogated by the police while in custody in the absence of counsel, with particular reference to such cases as the Government of Virgin Islands v. Solis, 334 F.2d 517 (3 Cir. 1964), Government of Virgin Islands v. Reyes and Aquino, 378 F.2d 540 (3 Cir. 1967), I am of the opinion that our Circuit Court, in the absence of guidance from the United States Supreme Court, would in an instance such as this decline to exercise its supervisory powers and make applicable to Virgin Islands prosecutions the provisions of 18 U.S.C. § 3501. Accordingly, the motion to suppress the confession of the defendant Robert E. Williams and all evidence derived or obtained by the police by virtue of the said confession is hereby granted.

**UNITED STATES of America,
Plaintiff,**

v.

**F M C CORPORATION, Defendant.**

**Civ. A. No. 37123.**

United States District Court
E. D. Pennsylvania.

Aug. 22, 1969.

Donald G. Balthis, John W. Neville, Jon D. Hartman, L. Barry Costilo, Attys., Dept. of Justice, Antitrust Div., Philadelphia, Pa., for plaintiff.

Drinker, Biddle & Reath, by Lewis H. Van Dusen, Philadelphia, Pa., Sullivan & Cromwell, by Wm. Piel, Jr., John E. Donnelly, David L. McLean, New York City, for defendant.

## OPINION

HIGGINBOTHAM, District Judge.

### I.

### PRELIMINARY STATEMENT

In this civil action the plaintiff, the United States of America, seeks to restrain and enjoin alleged violations of Section 1 of the Sherman Antitrust Act by the defendant, FMC Corporation (hereinafter FMC). Briefly summarized the complaint charges that, beginning in at least 1955, FMC and several other members of the so-called "chlor-alkali" industry engaged in a combination and conspiracy, which had as its object the elimination of price competition in the sale of chlorine, caustic soda and soda ash. The conspiracy is alleged to have taken the form of meetings, informal discussions, telephone calls and written correspondence. The complaint further alleges that the effect of the combination and conspiracy has been to unreasonably restrain interstate commerce by restricting and controlling competition among the co-conspirators; and the plaintiff therefore prays the Court to issue an injunction prohibiting further activities in pursuance of the conspiracy.

The principal manifestations of the conspiracy were alleged to be:

(1) Discussions and communications among the alleged conspirators leading to agreements to raise the prices of chlorine, caustic soda and soda ash in 1955 and 1956; of dry caustic soda in 1958; and of chlorine in 1960.

(2) Collusive efforts in 1958 and 1960 to maintain at an artificially high level the previously (1956) fixed list price of liquid caustic soda, by means of tacit agreements to restrict discounts to selected industries and users.

(3) Collusive attempts to maintain and perfect the freight equalization system used by the industry from a period of at least 1954 through 1958;

(a) by conspiring not to recognize Linden, New Jersey, as an equalization point for chlorine and caustic soda;

(b) by exchanging truck and barge rates which were not public information;

(c) by agreeing on minimum quantities which would entitle customers to lower barge rates; and

(d) endeavoring to eliminate any disparities in practice which might detract from the quotation of identical freight rates.

The complaint as originally filed on December 24, 1964, named as defendants FMC and eight other chlor-alkali producers. But, prior to trial the eight defendants other than FMC entered into consent decrees with the plaintiff, thereby settling the proceedings against them, without however admitting the substantive allegations of the complaint. FMC, as it had the right, elected to go to trial, denying in all material respects the allegations of the complaint.

The case was tried by the Court without a jury in a trial which lasted nineteen days. Diligent effort by counsel for both sides resulted in several stipulations which greatly facilitated the presentation of documentary evidence, thereby expediting trial of the issues.

At trial an issue arose concerning the admissibility as substantive evidence in this case of testimony given by one of the plaintiff's key witnesses before a federal grand jury which investigated the chlor-alkali industry in 1961 and 1962, but failed to bring indictments. The court denied the plaintiff's motion to introduce the testimony as substantive evidence of the matters asserted therein under the past recollection recorded exception to the hearsay rule; but so that, if the case is appealed, the re-viewing court may have the benefit of knowing what the court's findings would have been had the testimony been admitted into evidence, the court, pursuant to Rule 43(c), F.R.Civ.P.,[1] and by agreement of counsel, made additional alternative findings based upon the excluded testimony.

██ The court, after giving careful consideration to the pleadings and evidence, including exhibits and stipulations, the memoranda and briefs submitted by the parties, and the oral arguments of counsel, concludes that, with respect to certain elements charged in the complaint, the Government has sustained its burden of proving that there existed a combination and conspiracy which had as its purpose and effect the elimination of price competition in the sale of chlor-alkali products; but as to other elements of the complaint the Government failed to sustain its burden. In support of that holding, the Court now makes the following Findings of Fact and Conclusions of Law, separately stated.

## II.

### FINDINGS OF FACT

#### A. GENERAL FINDINGS.

(1) Defendant FMC Corporation is organized and exists under the laws of the State of Delaware and has its principal place of business and main office in San Jose, California.

(2) Jurisdiction of the subject matter duly appears and proper venue of the defendants is not contested.

(3) Except as otherwise stated or required by context, the facts herein found occurred or existed within the period from January 1, 1955 to December 24,

1. Rule 43(c). *Record of Excluded Evidence.* In an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of what he expects to prove by the answer of the witness. * * * The court may add such other or further statement as clearly shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. In actions tried without a jury the same procedure may be followed, except that the court upon request shall take and report the evidence in full, unless it clearly appears that the evidence is not admissible on any ground or that the witness is privileged.

1964 (hereinafter referred to as the "period covered by the Complaint"), and occurred or existed within, and are limited to, the area of the Continental United States generally east of the Rocky Mountains.

(4) The three "chlor-alkali" commodities—chlorine, caustic soda and soda ash—to which the allegations of the complaint refer, are sold and shipped in interstate commerce by the defendant FMC Corporation and by the other producers thereof with whom FMC competes in such commerce.

(5) Although dismissed as parties to this action the eight other former co-defendants listed below were alleged by the government to be co-conspirators with FMC, and, for purposes of brevity, will be referred to hereinafter by the following abbreviated terms:

Allied Chemicals Corporation .....................Allied

Diamond Alkali Company .....................Diamond

Dow Chemical Company ...........................Dow

Hooker Chemical Corporation ....................Hooker

Olin Mathieson Chemical Company ...................Olin

Pennsalt Chemicals Corporation .................Pennsalt

Pittsburgh Plate Glass Company ......Columbia Southern [2]

Wyandotte Chemicals Corporation ..............Wyandotte

(6) As it has been used throughout the trial pursuant to the stipulation of the parties, the term "list price" as used in these findings means the sellers F.O.B. plant price for sales in the area of the Continental United States generally east of the Rocky Mountains, exclusive of freight charges, as announced by the seller (and this verb as herein used shall mean announced, publicized, circulated or made available to its sales personnel for open quotation) by one of the following means:

(a) Distributing to the trade generally sheets setting forth the price lists;

(b) Informing the trade press, such as the "Oil, Paint and Drug Reporter", of its list prices; or

(c) Distributing to its own sales organization an internal price book or price book sheet setting forth the list prices with authority to its salesmen to quote such prices openly and generally.

## B. THE PRODUCTS AND THE BASIC CHARACTERISTICS OF THE CHLOR-ALKALI INDUSTRY.

(7) The principal products of the chlor-alkali industry, and those involved in the present action, are chlorine, caustic soda and soda ash. The products are basic industrial chemicals having a wide variety of uses.

(8) Chlorine is one of the chemical elements. While there are chemical processes for the recovery of chlorine from various of the compound forms in which it occurs in nature, about 93% of the commercially produced chlorine in recent years has been produced by the electrolysis of ordinary salt (NACL). Salt brine is placed in "cells" through which an electric current is passed, resulting in the decomposition of the salt and the production of chlorine gas, some hydro-

2. During the years 1955 through 1960, Pittsburgh Plate Glass Company's chlor-alkali operations were conducted by its corporate subsidiary, Columbia Southern Chemical Corporation. On December 30, 1960, the assets of Columbia Southern were acquired by the parent which then conducted these operations in its own name, beginning January 1, 1961.

gen gas and a solution of caustic soda (NAOH). By this process, the production of one ton of chlorine is accompanied by the production of 1.1 tons of caustic soda.

The cells used in the electrolytic process are of various designs, improvements having been introduced and licensed to others by Hooker, Diamond Alkali, Columbia Southern and Dow. A predecessor of the Olin Mathieson Chemical Corporation introduced a mercury cell which has been extensively used in recent expansions of electrolytic chlorine production because the caustic soda it produces may be used directly in the rayon industry without further purification.

Among other uses, chlorine is utilized in water purification, bleaching, pulp and paper, general germicides and deodorants and in the manufacture of inorganic chlorides.

(9) Caustic soda (Sodium Hydroxide —NAOH) is co-produced with chlorine in the electrolysis of salt, in the proportion of 1.1 tons of caustic soda to one ton of chlorine. This method has steadily replaced the former common method of producing caustic soda by the reaction of slaked lime (calcium carbonate) with soda ash (sodium carbonate), until by 1965 it was estimated to account for 98% of the caustic soda produced. In the electrolytic process an electric current is passed through a salt brine solution in specially designed cells. The salt brine is decomposed by the current to form a 10% to 12% sodium hydroxide solution, with hydrogen gas forming at the cathode and chlorine gas at the anode as co-products. Further processing of the sodium hydroxide solution removes impurities and residual undecomposed salt and some of the water so as to produce a concentrated solution of 50% or 70%– 74% sodium hydroxide. For general industrial purposes, the recognized grades are "commercial" and "rayon".

Liquid caustic soda is used, among others, in the manufacture of viscose rayon, paper pulp, soap, dyes, water softening compounds, chemical intermediates, and in many other industries and processes.

(10) Anhydrous (or dry) caustic soda is a dehydrated form of the more common and more widely used liquid caustic soda. The further processes necessary to convert liquid caustic soda into dry caustic soda include precipitation of impurities and essentially complete evaporation of all remaining water by heating in fusion pots. Dry caustic soda is commonly delivered in commerce in drums, either· in solid mass (700 pounds to the drum) or in flake form (400 pounds to the drum).

(11) Soda ash (Sodium Carbonate) is a basic industrial intermediate chemical. The major production of soda ash historically has been by the ammonia-soda or Solvay process, a chemical procedure involving the reaction of saturated salt brine with ammonia and carbon dioxide. Other methods are the mining and treating of natural deposits of trona ore (sodium sesquicarbonate) to obtain sodium carbonate (the method used by F MC); and the electrolytic method involving the treatment of the diluted caustic liquor from chlorine-caustic cells, to produce a sodium·bicarbonate solution from which soda ash is made. In 1962, the ammonia soda process accounted for 80% of the soda ash production, natural soda for the balance. Since 1935 no new plants have been constructed in the United States for production of soda ash by the Solvay process and other methods of production have been increasing their share of production.

Soda ash is used, among others, in the manufacture of glass, paper and pulp, soap, detergents, aluminum and other chemicals and water treatment.

(12) Chlorine, caustic soda and soda ash are interrelated on the basis of production, pricing and use. They are basically homogeneous products. Although there may be different grades of a given product, e.g., light and dense soda ash, or regular grade and rayon grade caustic soda, the number of different grades is small and within a given grade there is

no commercially significant variation in quality or character as among the various producers.

(13) Much of the use of both caustic soda and soda ash is for their sodium oxide ($Na_2O$) yield, since sodium oxide is one of the chief basic alkalyzing agents. Commercial soda ash contains from 48% to 58% sodium oxide depending on the grade. The common commercial grades of caustic soda contain sodium oxide in percentages ranging from 60% to 76%. Consequently, depending on the relationship of the prices which the customers must pay for quantities of soda ash and caustic soda yielding equal amounts of sodium oxide, and on necessary capital investment in process and equipment needed to convert from soda ash to caustic soda, or vice versa, several industries are potential users of either product. The soap and detergent industry, the glass industry and the aluminum industry have in some degree either made or proposed making a switch from one product to another.

(14) End use consumers account for a relatively small fraction of the total annual purchases of chlor-alkali commodities. These materials are purchased ordinarily by manufacturers for use as basic or intermediate raw materials in the production or compounding of other materials, or as solvents or alkalyzers in various manufacturing and converting processes.

(15) The major portions of chlor-alkali sales are made to large buyers of the products, such as soap manufacturers, aluminum companies, pulp and paper plants, glass manufacturers and other chemical companies on long term contracts, generally of a year or more. These contracts, usually contain "price notification" and "price protection" clauses. The former requires the supplier to give the buyer notification of any price increases within a specific period of time prior to the effective date of the increase. The latter provides that if the buyer receives a better offer from another supplier for the same amount of the same product, the con-

tracting supplier must, when notified of the offer, meet it within a specified period of time or the buyer will be excused from the terms of the contract. Contracts also provide that price changes may be made only quarterly, i. e., January, April, July, October.

(16) Most large corporate buyers of chlor-alkali products are represented in sales negotiations by purchasing agents knowledgeable of the market and its conditions, and generally have two or more suppliers of the same product even though one supplier might be able to supply all of the buyer's requirements for that product. The reasons for this practice are to protect the buyer against strikes or other disruptions in his supply and transportation of these products, and to have enough suppliers to maintain a favorable bargaining position in seeking the best possible contract terms.

(17) The stipulated evidence shows that, except at times when the published list prices of chlor-alkali products offered in the merchant market were being changed, or when efforts to change such prices were being made by various of the chlor-alkali producers, by public announcement of price changes, the published list prices of all domestic chlor-alkali products sold East of the Rocky Mountains were uniform at any given time during the period covered by the complaint.

(18) During the period covered by the complaint substantial portions of chlor-alkali sales of various of the producers were made at off-list prices, either in the form of individual price concessions to selected customers, or as price discounts to customers in a particular industry, such as rayon or pulp manufacturing.

(19) Generally speaking, demand for chlor-alkali products is inelastic in nature. Since there is little market for chlor-alkali products as end products, demand is normally determined by conditions of the various markets for the products which are produced through use of chlor-alkalis. For this reason a market move or condition which directly affects

only chlor-alkali products, such as price discounts by individual producers, while it may affect their share of the market, will have only an indirect effect on total demand. Thus, elasticity of demand in the case of chlor-alkali products is largely confined to the cross-elasticity of demand between caustic soda and caustic ash noted in Finding 13.

(20) During the period covered by the complaint, caustic soda was chronically in long supply, due to the fact that its increased output was largely attributable to increased demand for its co-product chlorine. Therefore, finding additional uses for caustic soda was a recurring problem for the industry.

(21) In 1960 FMC and the eight former co-defendants were the top nine producers of chlor-alkali products, except that Hooker and Pennsalt had no soda ash capacity. Collectively, they controlled 82% of the United States chlorine capacity; 88% of the caustic soda capacity and over 95% of the soda ash capacity, and total combined sales of these chlor-alkali products by these nine companies was of similar magnitude.

## C. FINDINGS AS TO FMC CORPORATION

(22) FMC Corporation, organized under the laws of Delaware, has its principal place of business and main office in San Jose, California, and offices which serve as the operating headquarters of its chemical divisions in New York, New York. It is owned by approximately 38,000 stockholders, the largest of which owns less than one per cent of its capital stock. It is a diversified manufacturing company producing a number of lines of machines, mechanical equipment and parts, tools and agricultural, household, industrial and miscellaneous chemicals. Included among the more than 150 chemical products are chlorine, caustic soda and soda ash, which in 1964 accounted for slightly less than four per cent of its total sales.

(23) In 1960 FMC's total sales of all products was about Three Hundred and Fifty Million Dollars ($350,000,000),

with chlor-alkali products accounting for over Twenty Million Dollars ($20,000,000), over four per cent (4%) of combined industry shipments of such products for that year considered on a national basis.

FMC's Twenty Million Dollars ($20,000,000) of sales of chlor-alkali products in 1960 were accounted for as follows:

| | |
|---|---|
| Soda Ash | $9.5 (million) |
| Liquid Caustic | 8.0 |
| Liquid Chlorine | 2.4 |
| Dry Caustic | 0.6 |

(24) FMC entered the chlor-alkali field in 1948 when it acquired the Westvaco Chemical Corporation, which had a plant for the production of chlorine and caustic soda at South Charleston, West Virginia, and began a plant for processing trona into soda ash at Green River, Wyoming.

(25) During the period covered by the complaint FMC produced chlorine and caustic soda at its plant in South Charleston, West Virginia, and soda ash at its plant at Westvaco, Wyoming; except that, several years ago (the date does not appear in the evidence) FMC discontinued the production of dry caustic soda.

(26) In 1952, the Westvaco organization was reconstituted within the FMC corporate structure as two chemical divisions: a "Mineral Products Division" handling the production and sale of phosphates, phosphorous, magnesium and barium products; and a "Westvaco Chlor-Alkali Division" handling the production and sale of the products produced at South Charleston, West Virginia and Green River, Wyoming. Frank Farley was made general manager of the new chlor-alkali division.

(27) In 1954 Arthur F. Smith was made sales manager of the Chlor-Alkali Division. Mr. Smith had been with the FMC chemical division and its predecessor Westvaco Chemical Company since 1941. Prior to becoming sales manager, Mr. Smith occupied successive positions

as salesman, district manager, product manager and assistant sales manager.

As sales manager, Mr. Smith's responsibilities included among others, assisting in formulating sales policy, and making and passing on recommendations for the pricing of chlor-alkali products. During his tenure as sales manager, 1954 through April, 1958, Mr. Smith reported directly to Mr. Farley and to Mr. Farley's successor as general manager, Mr. Frederick Gilbert.

(28) As sales manager, Smith was an executive of sufficient responsibility to FMC to render it liable for his acts if he engaged in activities prohibited by the Sherman Antitrust Act.

(29) In April, 1958, a further reorganization of FMC's chemical divisions was carried out. An Inorganic Chemicals Department was created with three sub-ordinate chemicals divisions, one of which was the Chlor-Alkali Division. Fred Gilbert was promoted from General Manager of the Chlor-Alkali Division to Corporate Vice-President and General Manager in charge of the Inorganic Chemical Department. Donald C. Oskin was promoted from Sales Manager, Mineral Products Division to Vice-President in charge of sales for the Inorganic Chemicals Department. Arthur Smith was discharged from his position as sales manager of the Chlor-Alkali Division, and his employment with FMC was terminated.

(30) As of 1957, FMC's rank among domestic producers of the chlor-alkali commodities, in terms of production capacity and total shipments, and its approximate percentage share of the domestic totals were as follows:

|  | CAPACITY | | SHIPMENTS | |
| --- | --- | --- | --- | --- |
|  | Rank | Percent | Rank | Percent |
| Chlorine | 9th | 3.8 | 8th | 5.6 |
| Caustic Soda | 9th | 3.7 | 8th | 4.3 |
| Soda Ash | 6th | 7.5 | 6th | 7.3 |

D. THE 1955 AND 1956 CHLOR-ALKALI PRICE INCREASES.

(31) On August 19, 1955, Dow announced a $2.00 per ton Eastern list price increase for liquid caustic soda, raising its list price to $56.00 per ton, single unit tank cars, F.O.B. plant, regular grade, 50% NaOH; to $58.00 per ton single unit tank car, F.O.B. plant regular grade, 70%–74% NaOH; and to $60.00 per ton single unit tank car, F.O.B. plant, rayon grade, 70%–74% NaOH; all to be effective for contract sales on October 1, 1955, and effective for spot sales immediately. Within approximately twenty-one days after this announcement all of the other domestic producers of chlorine, including FMC, increased their respective list prices by the same amount as Dow, effective for contract sales on October 1, 1955, and effective for spot sales on, variously, the dates of the respective announcements, the effective date for contract sales, or some date between those dates.

(32) On August 19, 1955, Dow announced a $5.00 per ton Eastern list price increase on anhydrous caustic soda, raising its list prices of solid caustic soda to $82.00 per ton, 700 pound drums, carload lots, F.O.B. plant and flake caustic soda to $90.00 per ton 400 pound drums, carload lots, F.O.B. plant, to be effective for contract sales on October 1, 1955 and effective for spot sales immediately. Within approximately twenty-one days after this announcement, all domestic merchant producers, including FMC and its former co-defendants, increased their respective list prices by the same amount as Dow, effective for contract sales on October 1, 1955 and effective for spot sales on, variously, the dates of the respective announcements, the effective

dates for contract sales, or some date between those dates.

(33) On September 2, 1955, Columbia-Southern announced a $2.40 per ton list price increase on chlorine, raising its list price to $61.00 per ton single unit tank car, F.O.B. plant, to be effective for contract sales on October 1, 1955, and effective for spot sales immediately. On the same date, and with the same effective dates for contract and spot sales, Columbia-Southern also announced an increase in list price to $78.40 per ton, F.O.B. plant, for chlorine shipped in multiple unit tank cars in lots of 75 tons or more. FMC and its alleged co-conspirators (except Wyandotte and Dow with regard to multiple unit tank cars, since they do not ship chlorine by this method) as well as all other domestic producers of chlorine, later increased their respective list prices by the same amounts as Columbia-Southern, effective for contract sales on October 1, 1955, and effective for spot sales on, variously, the dates of the respective announcements, the effective date for contract sales, or some date between those dates.

(34) On August 19, 1955, Allied announced a $2.00 per ton list price increase on soda ash, raising its list prices for carload lots, railroad bulk hopper cars, to $29.00 per ton, F.O.B. plant for light ash and $30.00 per ton, F.O.B. plant for dense ash, to be effective for contract sales on October 1, 1955, and effective for spot sales immediately. On the same date and with the same effective dates for contract and spot sales, Allied also announced an increase in list prices to $1.75 per 100 pound paper bag, F.O.B. plant, for light soda ash and to $1.80 per 100 pound bag, F.O.B. plant, for dense soda ash. Within approximately fourteen days after this announcement all domestic producers of soda ash, including FMC and its alleged co-conspirators (except Pennsalt, which did not produce soda ash) increased their list prices by the same amount as Allied (except Hooker, with regard to bulk hopper car sales which it did not make), effective for contract sales on October 1, 1955, and effective for spot sales on, variously, the dates of the respective announcements, the effective date of contract sales, or some date between those dates.

(35) The next change in list prices occurred on August 28, 1956, when Columbia-Southern announced a $2.00 per ton Eastern list price increase on chlorine, raising its list price to $63.00 per ton, single unit tank cars, F.O.B. plant, to be effective for contract sales on October 1, 1956, and effective for spot sales immediately. On the same date, and with the same effective dates for contract and spot sales, Columbia-Southern also announced an increase in Eastern list price to $81.00 per ton, F.O.B. plant for chlorine shipped in multiple unit tank cars in lots of 75 tons or more. All of the merchant producers who were selling chlorine in single or multiple unit tank cars later increased their respective Eastern list prices by the same amounts as Columbia-Southern, effective for contract sales on October 1, 1956, and effective for spot sales on, variously, the dates of the respective announcements, the effective date for contract sales, or some dates between those dates.

(36) In early September, 1956, Dow announced a $2.00 per ton Eastern list price increase on liquid caustic soda, raising its list price to $58.00 per ton, single unit tank car, F.O.B. plant, regular grade 50% NaOH; to $60.00 per ton, single unit tank car, F.O.B. plant, regular grade 70%–74% NaOH; to $60.-00 per ton, single unit tank car, F.O.B. plant, rayon grade 50% NaOH; and to $62.00 per ton, single unit tank car, F.O. B. plant, rayon grade, 70%–74% NaOH; all to be effective for contract sales on October 1, 1956, and effective for spot sales immediately. Within approximately fourteen days after this announcement all of the merchant producers who were selling liquid caustic soda in any of those grades and solutions increased their respective list prices by the same amount as Dow, effective for contract sales on October 1, 1956, and effective for spot sales on, variously, the dates of the re-

spective announcements, the effective date for contract sales, or some dates between those dates.

(37) In early September, 1956, Dow announced a $4.00 per ton Eastern list price increase on anhydrous caustic soda, raising its list prices for solid caustic soda to $86.00 per ton, 700 pound drums, carload lots, F.O.B. plant and flake caustic soda to $94.00 per ton, 400 pound drums, carload lots, F.O.B. plant, to be effective for contract sales on October 1, 1956, and effective for spot sales immediately. Within approximately fourteen days after this announcement all of the merchant producers who were selling dry caustic soda in either form had increased their respective Eastern list prices by the same amount as Dow, effective for contract sales on October 1, 1956, and effective for spot sales on, variously, the dates of the respective announcements, the effective date for contract sales, or some date between those dates.

(38) In early September, 1956, Allied announced an Eastern list price increase of $2.00 per ton on soda ash, raising its list price for carload lots, railroad bulk hopper cars to $31.00 per ton, F.O.B. plant, for light ash and to $32.00 per ton, F.O.B. plant, for dense ash, to be effective for contract sales October 1, 1956, and effective for spot sales immediately. On the same date and with the same effective dates for contract and spot sales, Allied also announced an increase in Eastern list price to $1.85 per 100 pound paper bag, F.O.B. plant, for light ash and $1.90 per 100 pound paper bag, F.O.B. plant, for dense ash. Within approximately fourteen days after this announcement all of the merchant producers who were selling soda ash in these grades and lots had increased their respective Eastern list prices by the same amounts as Allied, effective for contract sales on October 1, 1956, and effective for spot sales on, variously, the dates of the respective announcements, the effective date for contract sales, or some date between those dates.

(39) No direct evidence was offered at trial of an agreement or arrangement among the chlor-alkali producers to make price increase announcements by pre-arrangement, i. e., to "establish their prices on chlor-alkali products jointly, concurrently and in unison" (Complaint, ¶ 23(a)). Plaintiff seeks to have such alleged facts found by inference from the testimony of its key witness, Alfred F. Smith, former sales manager for the Chlor-Alkali Division of FMC. Smith testified that during the approximately four years of his tenure as sales manager he discussed prices, "collectively or individually" with officers and executives of other chlor-alkali producers, whose names were suggested to him by counsel for the plaintiff, and that, although he was unable to recall anything about these discussions, or have any specific recollection of any of these discussions, and had no particular recollection of the several price increases which occurred during this four years as sales manager, no price increase announcement that did occur ever came as a surprise to him; the source of his information "could" have been discussions and meetings, and "probably" was obtained through conversations with competitors.

(40) Viewed in the context of his testimony considered as a whole, the vague assertions by Arthur Smith, that no price increases occurred in the industry while he was sales manager which he did not have prior knowledge of, and that he *could* have learned of these increases through meetings or discussions with competitors, are an insufficient basis upon which to predicate the existence of an understanding or agreement to fix prices; particularly in view of Smith's equivocal testimony that he did not recall how he obtained this prior knowledge, and could recall neither specific meetings at which prices were discussed, nor even the substance of any meetings he attended related to pricing of chlor-alkali products.

(41) Of the twenty or so officials of the other chlor-alkali producers with whom Smith testified that he discussed

prices, "individually or collectively", twelve were called as witnesses by either the plaintiff or the defendant. Several testified that they did not know Smith, or knew him slightly; but all testified explicitly that they had no discussions with Smith, nor were they present with him at any meetings which involved agreeing upon, arranging or concurring in any price increase announcements in 1955 or 1956. To the extent that there is a conflict in testimonial recollection between these witnesses and Smith, the Court finds the testimony of the former to be more credible.

(42) There is no credible evidence in this case of any meetings or communications, oral or written, between representatives of FMC and its alleged co-conspirators leading up to the chlor-alkali price increases of 1955 and 1956; or evidence of any agreement or concert of action between the parties to eliminate price competition during those years.

(43) There is credible evidence in this case explaining both the phenomenon of uniform list prices and contemporaneous price movements by competing producers, and the means by which competing producers could learn of anticipated price actions by competitors prior to their official announcement, absent consultation among competitors.

(a) Uniformity of published list prices without more is not evidence of collusion among competitors. The evidence demonstrates that in a commodity market in which the products are basically homogeneous or fungible (i. e., each is identical with its counterpart in a particular category or grade), as is the case in the chlor-alkali industry (Finding 12), list prices are usually identical within a given freight zone. List price uniformity is even more likely where the principal market for these homogeneous products is as raw or intermediate materials in the production of other products (Finding 14) sold to large industrial users (Finding 15), having two or more suppliers of the same product (Finding 16), under long term contracts containing "price protection" and "price notification" clauses (Finding 15) and represented in sales transactions by skilled and informed purchasing agents (Finding 16); because under these conditions demand is inelastic, no producer can successfully sell at a higher price than its competitors, and if it attempts to sell at a lower price, unless the buyer is sworn to secrecy, under the price notification and protection clauses of the supply contracts the discounting seller's competitors will be given the opportunity to meet its lower prices, resulting in uniform prices again, but at a lower level, and without any increase in the seller's net share of the market.

(b) As a matter of good customer relations, chlor-alkali producers generally notify important customers of planned price changes by direct announcement prior to officially releasing the information to the news media. Since some chlor-alkali producers, in certain situations, were large suppliers to competing producers, as customers these competitors also received prior notice.

(44) In 1955, FMC was a major soda ash customer of Allied Chemical Company, purchasing nearly $1,000,000 worth per annum for use at FMC's Cartaret, New Jersey phosphate plant. As a major customer, FMC was notified by Carleton Bates, President of the Solvay Division of Allied, of Allied's planned 1955 price increase by direct announcement, prior to the official announcement.

(45) There is insufficient credible evidence in this case from which the Court can find or infer that the 1955 and 1956 increases in the prices of chlorine, liquid and dry caustic soda and soda ash were the result of any understanding or agreement between FMC and its alleged co-conspirators.

E. THE 1958 DRY CAUSTIC SODA PRICE INCREASE.

(46) On March 11, 1958, FMC announced an Eastern list price increase of $10.00 per ton on anhydrous caustic

soda, raising the list prices of solid caustic soda to $96.00 per ton, 700 pound drums, carload lots, F.O.B. plant, and of flake caustic soda to $104.00 per ton, 400 pound drums, carload lots, F.O.B. plant, to be effective for contract sales on April 1, 1958, and effective for spot sales immediately. Within approximately four days each other merchant producer who was at that time selling and offering for sale anhydrous caustic soda increased its respective Eastern list prices, for those forms and packaging which it was selling by the same amount as FMC, effective for contract sales on April 1, 1958, and effective for spot sales on, variously, the dates of the respective announcements, the effective date for contract sales, or some date between those dates.

(47) The list price of dry caustic soda has traditionally been higher than that of liquid caustic soda reflecting the added expense of the further processing steps required for converting the liquid to solid as referred to in Finding 10, supra. This price differential had become inadequate, however, to return a profit to offset the increased costs of further processing.

(48) At the time of the price increase, FMC was a relatively small producer of dry caustic soda. It continued to produce dry caustic soda purely as a service to customers of liquid caustic, at costs substantially exceeding sales revenue, until eventually closing down its dry caustic soda plant entirely in the early 1960's.

(49) Arthur Smith of FMC was a strong proponent of the view that the price differential between liquid and dry caustic soda should be increased to more accurately reflect the added cost of producing the latter. He expressed this opinion both to his superiors in FMC and to sales executives of competing producers. From at least 1956 until the time of the dry caustic increase announced by FMC in March, 1958, Smith sought a $10 per ton increase in the price of dry caustic soda by FMC; and, because of his view that the chances of a price increase "sticking" were not good unless all major producers joined in such an increase, sought the concurrence of competing producers in making such a price increase.

(50) Arthur Smith had information, in the form of a report, prepared for him by the FMC chlor-alkali production department documenting the additional costs involved in making dry caustic soda from the liquid caustic. The report was prepared to provide Smith with a factual basis for his position that a price increase on this product was needed. It was Smith's idea that the increase be $10 per ton.

(51) In 1956, Arthur Smith attended a luncheon at the University Club in New York City. The luncheon was hosted by John Coey, Eastern Sales Manager of Hooker Chemical Co. Present also were a number of executives of other companies which produced and sold flaked dry caustic soda. Coey's purpose in bringing these persons together was to explore the possibility of standardizing the size of openings in the heads of drums in which flaked dry caustic soda was shipped. A proliferation of sizes of drum heads preferred by various producers and customers created inventory problems for both, as producers had customers requiring different size containers, the customers, who sometimes used the same drums to repackage and ship their own products, in turn each had several suppliers of dry caustic. In addition, Coey felt that the different sized heads gave customers something to use as a wedge between different producers and made it difficult for them to compete on an "even" basis.

(52) Discussion during the luncheon referred to in Finding 51 revealed no concensus among producers as to a satisfactory drum head opening to serve as a standard, the various producers having various preferences depending upon the drum-forming machinery in which they invested, or on their inventory.

(53) At the end of the discussion at the luncheon, Smith of FMC sought to turn the discussion to dry caustic soda pricing, saying that he thought there should be an increase of $10 in the differential charge between liquid caustic soda and dry caustic soda; but Coey asserted that he was not authorized to discuss prices and immediately adjourned the meeting so that there was no further general discussion. After the adjournment of the meeting Smith continued to discuss the $10 a ton increase with others at the meeting.

(54) Within a month prior to announcing the dry caustic price increase on March 12, 1958, Smith discussed the proposed $10 a ton increase with, and received the required approval of, his immediate superior, Fred Gilbert, the then General Manager of the Chlor-Alkali Division. Smith informed Gilbert that he felt sure that the price increase attempt would succeed.

(55) Shortly before FMC announced the 1958 dry caustic soda price increase, Arthur Smith of FMC called John Coey of Hooker and Arthur Phillips, then Director of Sales for the Solvay Division of Allied Chemical Company. Smith informed each of these men that FMC was increasing its price for dry caustic soda $10 a ton, asked their reactions, and inquired whether their respective companies would support the price increase. Coey told Smith that he would believe Smith's statement when he saw it announced in the papers, but did not indicate to him that Hooker would go along with the increase. Phillips informed Smith that he was under definite company instructions not to discuss prices with competitors, and thus would not comment on Smith's statement. The next day Phillips informed his immediate superior, Lester Gordon, Vice-President of the Solvay Division of Smith's telephone call. Mr. Gordon in turn informed his superior, either the senior vice-president of the Solvay Division, H. F. Merritt, or the Division President, I. H. Munro.

(56) On the evidence, considered as a whole, the Court concludes that for an indefinite period of time preceding FMC's March 12, 1958 announcement of a $10 a ton increase in the price of dry caustic soda, Arthur F. Smith, sales manager of FMC's Chlor-Alkali Division sought an agreement on the part of FMC's competitors to support such a price increase, that he sought to discuss the cost-price squeeze in the marketing of dry caustic soda whenever the occasion presented itself, but further finds that he obtained no such agreement or assurances. At most the evidence supports a finding that he "thought" that other producers would follow FMC's lead, this was based on "conviction or hope"; but in his words, "I don't recall anyone ever saying that they would support me."

F. THE "PROCTOR AND GAMBLE INCIDENT", 1957–58.

(58) In the summer of 1957, Proctor and Gamble (P&G) purchasing agents, Braun and Heller, began systematic solicitations of P&G's multiple caustic soda suppliers to obtain supplies of caustic soda at lower cost. They informed each supplier that P&G had developed technology for using soda ash in its manufacturing process and, despite the capital cost of converting the facilities to use soda ash, would realize substantial savings by making the conversion if the price differential between caustic soda and soda ash continued to be the same. They indicated that a substantial reduction in the cost to P&G of caustic soda would be necessary to deter P&G from making the conversion.

(59) The P&G agents made their approach to FMC with regard to the cost of P&G's caustic soda supply in August 1957, in a meeting with Farley (general manager of FMC'c chlor-alkali division), Smith (sales manager under Farley), Preston Tinsley (assistant sales manager) and Richards (a "production manager"). FMC was selling small quantities of caustic soda to P&G at this time but was interested in increas-

ing its caustic soda position with P&G. Further, FMC could not have economically shipped soda ash from FMC's Wyoming plant to P&G's principal consuming location at Cincinnati, Ohio because freight costs would have been prohibitive. The FMC representatives responded favorably to the P&G agents and suggested that P&G consider a proposal by FMC to supply twenty-five thousand tons per annum of P&G's requirements at Cincinnati at a 10% discount from the prevalent list price. The P&G agents said that they would entertain such a proposal. Tinsley reported to Dr. Carl Prutton, then vice-president in charge of FMC's chemical divisions, about the possibility of obtaining additional P&G tonnage by granting a discount and was encouraged by Prutton to pursue the matter and study it. Thereafter however Smith alone handled almost all further discussions with the P&G agents and Prutton, who received no further report about developments until the spring of 1958 assumed that the opportunity had misfired or been dropped.

(60) In a conversation with P&G purchasing agent Braun on September 5, 1957, Smith assured him that:

(a) FMC would be willing to supply 30,000 tons of caustic soda at a 10% discount;

(b) If P&G were unsuccessful in obtaining a discount from other producers, FMC could handle an additional 30,000 tons of caustic soda per year;

(c) If the industry generally would not grant the discount, FMC would still grant it;

(d) If the discount became general, FMC would still sell caustic soda to P&G at 10% less than the going market price; and

(d) This proposal by Smith had the approval of FMC's management, with agreement on a contract term of five years. Smith repeated these assurances to Braun's superior, Haller, on September 7, 1957.

On September 12th, Smith told Haller of P&G that FMC was going to the industry to see if it could get agreement that P&G was entitled to a price concession, but if this was unsuccessful FMC would still itself grant the discount. At no time did Smith inform any of his superiors that he had given these assurances to P&G.

(61) Executives of various caustic soda producers attended a gathering held on October 24, 1957, at the Engineers Club in New York, hosted by Arthur Smith, and which at noon moved to the Yale Club of New York City. A second gathering, hosted by George Lawson, Sales Manager of Pennsalt, was held at the Yale Club on November 25, 1957. Present at these meetings were executives with pricing and sales responsibilities from FMC, Hooker, Olin Mathieson, Pennsalt, Dow, Allied and Wyandotte, among others. In addition, Fred Gilbert, then general manager of the chloralkali division of FMC was present at the luncheon portion of the November 24 meeting at the Yale Club.

(62) The subjects of discussion at the meetings were the approaches Proctor and Gamble had made to its caustic soda suppliers, the technical and economic feasibility of its threatened conversion from caustic soda to soda ash, and the impact which granting P&G's request for a discount might have on the entire caustic soda market. Smith, of FMC, without revealing the assurances he had given P&G on September 5 and 7, 1957, made clear his opinion that P&G's conversion plan was reasonable and feasible and that P&G was therefore entitled to a discount. Sherrod Scott, Director of Sales for Wyandotte, felt that granting the discount to P&G would influence the general level of caustic soda prices and bring them downward. Others present expressed the opinion that there was not enough information available to make a proper decision on whether or not to grant a discount to P&G and that more technical information should be developed. This was the opinion that prevailed.

Thus the meetings ended without agreement on what anyone would do. But some of those present left with the distinct impression that at least for the time being there would be no discount offered to P&G.

(63) On November 14, 1957, between the dates of the two gatherings referred to in Findings 61 and 62, supra, Smith reported to P&G purchasing agent Braun that other caustic soda producers were not supporting the view that P&G should get a discount, and that FMC would go it alone in giving P&G the discount and expected to be able to sign a contract in a few months.

(64) In December, 1957, Mr. Ernest Hart, then president of FMC, accompanied by Gilbert and Williams, then FMC vice-president, visited the P&G offices in Cincinnati. They discussed the P&G situation with Haller, the P&G purchasing agent who later reported to his superiors that FMC still expected to be able to go ahead and grant a discount "as planned". At this time, Smith's superiors in the FMC organization were unaware of the assurances and commitments already given to P&G by Smith.

(65) On December 26, 1957, Smith advised Haller of P&G that he was still optimistic about the chances for a deal.

(66) In anticipation of receiving a discount from FMC, P&G in the first two months of 1958 began substantially increasing its spot purchases of caustic from FMC for its Cincinnati plant, effectively displacing Columbia-Southern as a supplier at that location.

(67) In April of 1958, because of FMC's perceived vacillation on the question of granting a discount, Braun and another P&G purchasing agent called on FMC in New York and were told by Gilbert that FMC had not decided whether it would give P&G any discount. This statement by Gilbert was the first indication to P&G that FMC management did not fully support the proposals previously made by Smith. The P&G officials expressed the view that dealing with a bona fide representative of a company should be the same as dealing with the company itself, and criticized FMC's apparent undue concern over possible reaction by its competitors to a discount.

(68) In April, 1958, following the visit by P&G's purchasing agents, Donald C. Oskin, then a vice-president of FMC's Chemicals Division, and newly appointed Assistant General Manager of FMC's Inorganic Chemicals Department in charge of its Chemicals Division, was asked by Dr. Prutton, FMC's Executive Vice-President, to study the P&G matter and to try to resolve the P&G problem which was a subject of great concern to the FMC organization. Relations with P&G, FMC's largest account ($21 million in all chemicals, with $18 million in phosphates alone) were being jeopardized by FMC's nonaction on the subject of a discount on liquid caustic soda. Oskin who prior to his appointment in April, 1958, was not directly involved in the earlier handling of the P&G matter, was of a view that a discount should have been extended to P&G, and he was critical of FMC's vacillation on this matter. However, Oskin was initially overruled by his superiors and FMC continued to withhold decision on a discount to P&G.

(69) In April, 1958, Donald Oskin asked Ray Tower, Sales Manager of the Mineral Products Division of FMC to meet with P&G purchasing officials on a visit to P&G's Cincinnati offices to ascertain from them their understanding of the negotiations between FMC and P&G relating to a caustic soda discount or price reduction. Tower met Braun, one of the P&G purchasing agents, and on the basis of this meeting wrote a memorandum to Oskin detailing the chronology of events from P&G's initial approach to FMC up to that point, emphasizing the eroding good will of P&G toward FMC as a result of FMC's seeming vacillation on the question of a discount, and informing Oskin that P&G was determined to obtain a price reduction from the industry on its caustic soda purchases, in which FMC would not share unless it was the originator of such reduction. This memorandum and the

later memoranda prepared by Robert DeLargey, newly appointed General Manager of the Chlor-Alkali Division and J. H. Harris, newly appointed Sales Manager of the Chlor-Alkali Division were influential in ultimately persuading FMC executives to propose a discount to P&G.

(70) On May 6, 1957, DeLargey and Harris presented a detailed memorandum to Gilbert, which thoroughly analyzed the P&G caustic situation, setting forth its pros and cons, in terms of probable or possible economic gains or losses accruing to FMC in acting or failing to act on P&G's request for a discount. The factors which were evaluated were roughly characterized as:

"1 P&G's present and future attitude toward FMC depending on our actions.

"2 The alkali industry's actions and our own customers' actions, depending on how we justify or rationalize our actions."

(71) The authors' evaluation of the pros and cons led them to conclude that FMC had to find a way to make a package caustic soda deal with P&G, and that they had "only to figure out the best way to frame it and the most convincing explanation to the industry as to why it [was] essential to use", in order to prevent retaliatory action by the industry in the form of a broader caustic price reduction. The factors posited by the authors as most important in determining the best way to make a price concession to P&G were: (1) its legality under Robinson-Patman regulations, and (2) the extent to which FMC and the alkali industry would feel inclined or obligated to extend a similar price concession to other classes of customers. With these factors in mind the discount plan proposed was a discount of 10% off market price to all large users in the soap and detergent industry, including producers of detergent alkalyte. The authors concluded that the impact of the discount on the caustic industry could be minimized by:

"(1) Explaining the very large stake we [FMC] have at P&G.

"(2) Pointing to 'breakovers [price discounts and special deals] that have already occurred recently at P&G locations.

"(3) Emphasizing that the nature of the P&G deal is sufficiently narrow in its definition and application that it need not trigger a general caustic price break.

"(4) Delaying our grabbing of caustic and other chemical tonnage—beyond the 30,000 T/yr NaOH at Cincinnati, which we have already enjoyed through April, '58—till 1959."

(72) On May 12, 1958, Hart, Prutton and Oskin of FMC called on Haller and Braun in Cincinnati and made a discount offer on liquid caustic soda barge shipments, and other chemicals, to P&G at Cincinnati and elsewhere, on terms similar to those suggested in the May 6 DeLargey-Harris memorandum. FMC shortly thereafter received a proposed contract from P&G dated May 27, 1958, which contained slightly different terms, calling for additional tonnage to be shipped to P&G plants at St. Louis and Chicago. Hart, the President of FMC, felt that taking extra tonnage at the additional locations posed a greater risk of general price deterioration and retaliatory actions by other alkali producers so FMC struck out the additional terms in the contract; but rather than signing and returning the revised contract to P&G, Oskin made an appointment with P&G officials for June 4, 1958, to further explain FMC's position with regard to shipping tonnage to other locations, and in order to explain to its competitors its justification for the price discount and its precise terms. If, however, FMC had signed the proposed contract of May 29, 1958, it would have had the P&G caustic soda business.

(73) Before finally consummating its deal with P&G, Oskin and Gilbert, with the approval of Prutton, Executive Vice-President of FMC, travelled to Pittsburgh, Pa., on June 2, 1958, to a gather-

ing of executives of competing producers at the Roosevelt Hotel, to inform them of the discount which FMC was offering to P&G. Among those present were representatives of all of the major chlor-alkali producers named as co-conspirators in this case: Olin, Dow, Columbia-Southern, Diamond, Hooker, Allied, Pennsalt and Wyandotte. No satisfactory or persuasive explanation of the purpose for the meeting was offered at trial by any of those in attendance.[3] According to Oskin, he considered the meeting to be an occasion to allow he and Gilbert to explain FMC's discount proposal to its competitors. The court finds that that was the purpose for the gathering.

(74) FMC's reason for telling the other producers of the discount given to P&G was to provide those present with precise information as to exactly what FMC had done, so that if the other producers decided to respond to FMC's competitive move they would be reacting on the basis of current information, rather than by speculation or possible misinformation given by buyer's purchasing agents. In this way the officials at FMC hoped to avoid a general break on the price of caustic soda caused by producers going beyond the narrow discount proposed by FMC. This was in line with the suggestion for easing industry reaction to the discount made in the De-Largey-Harris memo of May 6th.

(75) When Oskin arrived at the P&G offices in Cincinnati on June 4, 1958, to close the caustic deal he was told by the P&G purchasing agents that P&G was going to have to give the matter further consideration.

(76) Columbia-Southern, which originally supplied caustic soda to P&G at its Cincinnati plant was displaced as a supplier at the beginning of 1958 when P&G, in the expectation that FMC was about to grant it a discount, gave all of its caustic business at Cincinnati to FMC. In early March of 1958, Columbia-South-

ern representatives called on P&G purchasing agents to find out why Columbia-Southern had received no order for the first two months of the year and were told only that others were doing more for P&G. Thereafter, Columbia-Southern caused a local representative to keep watch on the P&G track and P&G docks at Cincinnati, and as a result of this surveillance discovered that FMC had taken the business. On May 4, 1958, Columbia-Southern made P&G an offer of a five percent (5%) discount on liquid caustic soda barge shipments to Cincinnati. The P&G purchasing agents told the Columbia-Southern representatives that P&G already had two contracts and one proposal at a better price and that they were therefore turning down Columbia-Southern's offer.

(77) While FMC was waiting for P&G's decision, Columbia-Southern on June 18, 1958, offered P&G a ten percent (10%) discount on the Cincinnati caustic soda business, which P&G accepted a few days later. This offer by Columbia-Southern, substantially similar to that proposed by FMC, was made with knowledge of the nature and extent of FMC's prior proposal, as evidenced by Columbia-Southern's representation at the June 2, 1958 meeting referred to in Finding 73, supra, in the person of Chris Bingham, a vice-president.

On June 20, 1958, P&G informed FMC that FMC's offer was being turned down because a competitor had made a more acceptable offer.

(78) After P&G awarded most of its tonnage at Cincinnati to Columbia-Southern, there was still some tonnage open at Cincinnati, and at other P&G plants at St. Louis and Chicago. On February 4, 1959, FMC received the remaining 25% (8,400 tons annually) of P&G's Cincinnati caustic soda requirements at the discounted price.

(79) On the facts as found by the Court there is sufficient credible evi-

---

3. Only one witness, John Logan of Olin, had any recollection of an ostensible purpose for the meeting. According to him, it was called for the purpose of discussing the logistics of barging on the Ohio River. I decline to make that finding.

dence to support a finding that FMC and its major competitors met on October 24, 1957, November 14, 1957, and June 2, 1958, for the purposes of exploring all facets of P&G's conversion threat and request for a discount and exchanging all relevant information, so as to enable them to act in concert to stabilize the market for caustic soda by preventing any price erosion or break in the market which might be caused by the uncoordinated responses of chlor-alkali producers to P&G's request for a discount.

## G. ADDITIONAL FINDING BASED UPON THE EXCLUDED GRAND JURY TESTIMONY OF ARTHUR SMITH.

Considering the portions of Arthur Smith's testimony before the federal grand jury in 1962 and 1963, as though, contrary to the ruling of this Court, the testimony had been admitted as substantive evidence in this case, I find that while to a certain extent Smith's testimony before that body gave a more complete explanation of the means by which he was assertedly aware of all chlor-alkali price increases before they were publicly announced; his understanding of the nature of the price-fixing agreements entered into by the erstwhile competitors; his efforts to obtain agreement on a dry caustic price increase, and a caustic soda price discount for Proctor and Gamble; the difference is relative only. The testimony was characterized by much of the same vagueness as at trial with respect to specific events or occasions said to evidence the existence of a concert or conspiracy; and, in the absence of other evidence, is clearly insufficient to support a finding of the existence of a collusive agreement to fix prices. In addition, severe doubts were raised in the mind of the court as to the witness' reliability and credibility; thus it would be somewhat anomalous to accord more weight to testimony which the court had no opportunity to observe and was not subject to cross-examination than to testimony presented by the witness at trial to which the Court gives little weight.

To the extent that Smith's testimony before the grand jury is consistent with other evidence, its weight as corroborating evidence is not necessary to support the Court's findings.

## H. THE OUTING AT THE OLD CLUB, HARSEN'S ISLAND, MICHIGAN, JULY 8–9, 1958.

(80) On or about June 16, 1958, a Wyandotte study was prepared showing that certain major elements of costs had increased to the point where they now more than offset the increased revenue gained by Wyandotte from the price increases on chlorine, liquid and dry caustic soda and soda ash in 1956, and from the $10 per ton increase on dry caustic soda earlier in 1958. Bert Cremers a Wyandotte vice-president, wrote in longhand across the top of this document "take to Old Club meeting on July 9" and a note to secretary to "hold [this document] available."

(81) On July 8 and 9, 1958, Cremers hosted an outing at the Old Club, Harsen's Island, Michigan. The ostensible occasion for the gathering was to introduce Ed Block, recently named head of Olin's Chemical Division, to other executives of competing chlor-alkali producers. In attendance were executives from FMC, Hooker, Dow, Wyandotte, Pennsalt, Olin, Diamond Alkali, and Allied. Fred Gilbert, FMC vice-president and general manager of the Chemicals Division was among those present. Joseph Neubauer, president of Columbia-Southern, was invited, but declined to attend when he learned that executives from competing producers were to attend also.

(82) During the course of the gathering, Cremers showed his guests several charts and graphs reflecting cost and price trends for Wyandotte and eight other companies, identified only alphabetically. Among these charts and graphs were the following:

(a) Net Profit from Operations as per cent of Investment, 1948 and 1957;

(b) Cost and Price Changes 1952 to 1957;

(c) Wages and Salaries v. Profits, manufacturing Industries;

(d) Additional Tonnage Required to Maintain Constant Dollar Profit [Showing Additional Tonnage of Caustic Soda, Soda Ash and Chlorine which would have to be sold to offset price reductions];

(e) Sales Losses to Alkali Industry by Reducing Selling Prices (1957) (Production Basis).

(83) There is no evidence to show the nature of the discussions, if any, which followed Cremers presentation; nor is there evidence that there was any course of action proposed or agreement solicited by Cremers other than that which could be inferred from the nature of the charts. There is no evidence that the P&G discount was discussed at this meeting.

## I. THE CHLORINE INSTITUTE, ITS ADVISORY COMMITTEE AND INFORMAL GATHERING ON OCCASIONS OF ADVISORY COMMITTEE MEETINGS.

(84) The Chlorine Institute, whose membership includes among others the major producers of chlor-alkali products, exists to study and promote solutions to problems of safety in the production, transportation and use of chlorine and to educate and assist users and the public in that connection. It is staffed by an Executive Secretary, and directed by a Board of Directors.

(85) In August 1958, the Board of Directors of the Chlorine Institute approved a proposal to establish an advisory committee. The purpose of the committee was to consider subjects within the general conduct of the Institute affairs which required careful and special consideration. Meeting more frequently than the semi-annual meetings of the Board of Directors it was anticipated that the Advisory Committee would better be able to handle questions as they arose. On September 15, 1958, the Chair-

man of the Board of Directors appointed the committee, composed of executives of eight of the nine largest chlor-alkali producers, including FMC and all of its alleged co-conspirators, with the exception of Columbia-Southern (Pittsburgh Plate Glass). Fred Gilbert of FMC was a member of the original Advisory Committee, which held its first meeting on October 10, 1958, at the Chemists Club in New York City.

(86) The Advisory Committee met fifteen times from its formation in October, 1958 through 1960. Meetings regularly took place at the time of the semi-annual meeting of the Board of Directors of the Chlorine Institute, and at the call of the President of the Institute during periods in between. On two other occasions the Advisory Committee met at the Seigniory Inn in Montebello, Canada and the Skytop Club in Cresco, Pennsylvania, instances when the Chlorine Institute held its semi-annual meeting at these locations.

(87) Wyandotte Chemicals Corporation regularly maintained a suite of rooms at the Carlton House for the use of its executives when in New York City. Between 1958 and 1961, while Cremers of Wyandotte was a member of the Advisory Committee he generally hosted informal gatherings of the members and attendees of Advisory Committee meetings in the Wyandotte Suite, in the afternoon following the morning meetings. Neither the Secretary of the Chlorine Institute nor the Canadian member of the Committee, Mr. Converse of Canadian Industries, Limited (CID) were informed of or invited to these sessions, because some of those present expressed the view that they should not be there.

(88) At the informal gatherings in the Wyandotte Suite those present discussed matters which had been subjects of Advisory Committee meetings, and also sought to obtain "market intelligence" and exchanged information relating to industry problems. Cremers of Wyandotte would generally use the occasion to make a "speech" to those pres-

ent about the state of the industry, the poor profit situation and the need for higher prices for caustic soda and chlorine. Those present were in general agreement on the need for higher prices for chlorine, but there was conflicting opinion as to the desirability of increasing the prices of caustic soda and/or soda ash due to the differing interests of the producers, some of whom produced only caustic, others caustic soda and soda ash. FMC, attracting an increasingly large share of the soda ash market, maintained a strong sales policy of not increasing its prices for soda ash, and those present were informed of FMC's unwillingness to raise the price of soda ash, by Gilbert of FMC, a member of the Advisory Committee and an attendee of several of the informal gatherings in Cremers' suite.

(89) There is sufficient credible evidence in this case from which the court can find and infer that representatives of competing chlor-alkali producers serving as members of the Chlorine Institute's Advisory Committee did meet regularly following the formal business sessions of that Committee, and used those informal gatherings for the purpose of discussing industry problems and exchanging market information which would enable them to compete on an even price basis in the marketing of the chlor-alkali products involved in this action.[4]

### J. THE "RAYON INCIDENT."

(90) The rayon industry is a large user of caustic soda. In the late 1950's when nylon began to make serious inroads into the use of rayon for automobile tire cord, which represented a substantial amount of total rayon sales, members of the rayon industry lowered their prices to the tire industry and appealed to their suppliers, including caustic soda suppliers, to reduce the price of raw materials. In addition the industry trade association, the Tyrex Association, sought contributions from suppliers of caustic soda which could be used

to finance an advertising campaign to combat nylon. There is no direct evidence concerning the date when the Association first approached rayon suppliers for advertising contributions.

(91) FMC which supplied approximately 40,000 tons of caustic soda to the rayon industry in 1960, was one of those companies which received a request for a contribution to the Tyrex Association. After receiving the request, Donald Oskin, Vice-President and Assistant General Manager of the Inorganic Chemicals Department of FMC, telephoned William McConnell, an executive of Diamond Alkali and inquired as to whether, and if so how much, Diamond was contributing to the Tyrex Association. There is no evidence that Oskin made similar inquiries to others in the industry. Oskin's reason for seeking this information was to assist him in reaching a decision on how much, if anything, FMC should contribute to the Tyrex Association. FMC finally gave $1,000 or $1,500 to the Association while Diamond, McConnell having told Oskin that they would give $1,000, eventually gave $25,000.

(92) There is no sufficient or persuasive evidence from which the court can find or infer that FMC and any other chlor-alkali producers had or sought any agreement or understanding concerning what they or any of them would do about the Tyrex Association's request.

(93) Contributions made to the Tyrex advertising fund as well as other assistance from individual suppliers having proved inadequate, Olin, as the leading caustic soda supplier to the rayon industry, found itself under pressure to grant a straight percentage discount off list price of the rayon tire cord segment of the rayon industry. After receiving the request, Donald Drummond, Olin vice-president and primary Olin contact with the rayon industry, conditioned Olin's approval of such a discount on Tyrex's success in obtaining a discount from another of tire cord manufacturers principal raw materials suppliers, the pulp industry.

---

4. See Findings, infra, re *Rayon Incident.*

In January, 1960, when the President of the Tyrex Association informed Drummond that the pulp suppliers had granted a discount on sales of pulp to be used in the making of tire cord only, Drummond and John Logan, vice-president in charge of Heavy Chemicals decided that Olin would grant a similar discount. They drafted a telegram informing their rayon customers that Olin was granting them a 5% discount off the list price of caustic soda, specifically limited to liquid caustic soda used to make rayon tire cord (Tyrex) and not for other rayon uses. The telegram was sent on January 19, 1960.

(94) On the same date that Olin sent telegrams to its rayon customers notifying them of the discount which Olin was granting, a formal meeting of the Advisory Committee of the Chlorine Institute was held in New York City. Afterward, an informal gathering of the members of the Advisory Committee was held in the Wyandotte suite at the Carlton House Hotel (see Findings 87–89, supra). Logan of Olin, a member of the Advisory Committee attended the gathering, bringing with him three or four copies of the telegram which he had just sent to Olin's rayon customers. When asked by those present at the gathering about the nature of Olin's discount, Logan showed them copies of the telegram which set forth very precisely the exact nature and terms of the discount. Donald Oskin of FMC was shown a copy of the telegram and remarked that he felt that it would be difficult to limit the discount to the Tyrex segment of the rayon industry without its eventually spreading to the rest of the rayon industry. Logan expressed the hope that the discount could be so limited. There was some discussion among those present as to whether the discount could be so narrowly limited, or would spread to other uses.

(95) All other chlor-alkali producers, including FMC, immediately followed Olin with an identical 5% discount off the list price of caustic soda, limited to the Tyrex segment of the rayon industry. But after a period of approximately ten months the discount spread to all users of caustic soda in the rayon industry.

(96) Olin's action in hurriedly disclosing to its competitors the precise discount it had granted to a limited segment of the rayon industry was done with the hope of thereby preventing them from granting lower or additional discounts to the trade by advising the competitors that Olin was not granting such discounts to the rayon industry. This disclosure was done with the intent to stabilize the caustic soda market and that intent was understood and concurred in by the other chlor-alkali producers in immediately matching Olin's precise discount.

K. THE 1960 CHLORINE PRICE INCREASE.

(97) On February 25, 1960, Pennsalt announced a $4.00 per ton Eastern list price increase for chlorine, raising its list price to $67.00 per ton, single unit tank cars, F.O.B. plant, to be effective for contract sales on April 1, 1960 and effective for spot sales immediately. On the same date, and with the same effective dates for contract and spot sales, Pennsalt also announced an increase in its list price to $85.00 per ton F.O.B. plant, for chlorine shipped in multiple unit tank cars in lots of 75 tons or more.

(98) On the next day, February 26, 1960, Columbia-Southern announced a $2.00 per ton list price increase for chlorine, raising its list price to $65.00 per ton, single unit tank cars, F.O.B. plant, effective for contract sales on April 1, 1960, and effective immediately for spot sales. On the same date, and with the same effective dates for contracts and spot sales, Columbia-Southern also announced an increase in list prices to $83.00 per ton, F.O.B. plant, for chlorine shipped in multiple unit tank cars in lots of 75 tons or more.

(99) Within approximately three weeks after the announcements referred to in Findings 97 and 98, supra, Pennsalt rescinded its previous announcement and announced instead a $2.00 per ton list price increase on chlorine, and each

of the other merchant producers who were at that time selling chlorine in single unit tank cars or multiple unit tank cars, including FMC and its alleged co-conspirators, increased its respective list price or prices by the same amounts as Columbia-Southern and effective for contract sales on April 1, 1960, and effective for spot sales on, variously, the dates of the respective announcements, the effective date for contract sales, or some date between those dates.

### 1. *The Pennsalt Price Increase*

(100) The 1960 chlorine price increases were the first since 1956. But by at least 1958, internal studies prepared by individual chlor-alkali producers showed that certain major elements of cost, together with inflation had increased to the point where they more than offset the increased revenues gained from the price increases of 1956. By February of 1960, profit analyses within Pennsalt convinced Land, General Manager of Pennsalt's Industrial Chemicals Division, Eastern Region, of the desirability of a price increase on chlorine. He recommended a price increase of $5.00 per ton. One or two days before February 24, 1960, Drake, the President of Pennsalt, approved an increase limited to $4.00 a ton, and formally confirmed this approval in a memorandum to Land, dated February 24, 1960.

(101) Pennsalt's announcement of the $4.00 a ton increase in its list price for chlorine appeared in newspapers published on February 26, 1960. On the evening preceding the appearance of Pennsalt's announcement in newspapers, or the next preceding evening, Land made telephone calls to Bingham, sales manager of Columbia-Southern, and Munro, an officer of Allied, informing them of Pennsalt's price increase announcement and inquiring as to what the reaction or responses of their respective companies might be to this event. Land's telephone calls were motivated by his desire to achieve a price increase on caustic soda. Because of his belief that a caustic price increase

would not stick unless the price of soda ash was increased also, and since Pennsalt did not produce soda ash, Land hoped that by Pennsalt's taking the lead in increasing the price of chlorine, and thereby bearing the brunt of customer wrath, the major producers would decide to increase prices on caustic soda and soda ash; and in calling executive officers of the aforementioned companies, the dominant producers of these products, he sought to explore this possibility. However, each party declined to comment at all on his inquiries.

### 2. *The Columbia-Southern Price Increase.*

(102) By the fall of 1959, Neubauer, President of Columbia-Southern, had concluded that his company needed a price increase in chlorine. He was persuaded by his sales manager, Bingham, to postpone the announcement of an increase until just prior to the commencement of the second quarter of 1960, in order not to have the price increase announcement interfering with or complicating the negotiation and renegotiation of annual supply contracts with customers which would go into effect on January 1, 1960. Before Christmas 1959, it was settled within the Columbia-Southern management that such announcement would be made, the only undecided matter being whether the increase should be $2.00 or $2.50 per ton. In the early part of January, it was settled that the increase should be $2.00 per ton and that it should be announced shortly before the first week in March.

(103) When Pennsalt's $4.00 per ton announcement appeared in the press, Neubauer and Bingham decided immediately to accelerate Columbia-Southern's announcement, and thereupon made the announcement referred to in Finding 98, supra.

(104) On the same date that it announced its chlorine price increase, February 26, 1960, Columbia-Southern also announced a list price increase of $2.50 per ton on soda ash, effective for contract sales on April 1, 1960, and spot

sales immediately. None of the other merchant producers of soda ash increased its soda ash list price and Columbia-Southern rescinded its list price increase announcement in early March of 1960.

(105) On or about July 24, 1958, an official at Wyandotte prepared and sent to Cremers a study of the alkali industry's profits if the industry raised the price of chlorine $5.00 per ton and Columbia-Southern alone did not raise prices and therefore sold out their capacity. According to the calculations the net gain to the industry would be about $5.5 million. The study also showed that operating at 75% of capacity Columbia-Southern would make an additional $231,340 profit if they raised prices instead of selling out their capacity.[5] There is no evidence that this report or its conclusions were conveyed to Columbia-Southern either directly or indirectly.

(106) A calendar entry in the desk diary of Bingham of Columbia-Southern and a confirming telegram from Bingham to Cremers of Wyandotte noted a planned visit by Cremers to the former's office in Pittsburgh on July 29, 1958. There is no evidence concerning the purpose or results of the meeting, or that the meeting in fact occurred, and no evidence from which the Court can infer that if the meeting was held the Wyandotte study was discussed, or that the meeting had any bearing whatsoever on Columbia-Southern's 1960 chlorine price increase.

(107) In January of 1958, at a reception and buffet supper at the Cloud Club, Chrysler Building, New York City, Donald Ballman, a Vice-President of Dow, approached Joseph Neubauer, then President of Columbia-Southern, and during the course of the conversation asked Neubauer why Columbia-Southern did not raise the price of chlorine. Neubauer informed Ballman that he had no intention of raising the price of chlorine and didn't want to talk about it. Approximately four months later Ballman visited Neubauer's office in Pittsburgh and again asked Neubauer about raising the price of chlorine. He was told by Neubauer that he would not raise the price, and did not think that that was a proper subject of conversation. This contact was not in conjunction with any regular business appointment with Neubauer.

(108) In November, 1958, Bingham of Columbia-Southern attended a meeting at the Barclay Hotel in New York City, also attended by representatives of competing chlor-alkali companies. When his superiors at Columbia-Southern learned of his presence at such a gathering in contravention of Columbia-Southern's strict antitrust compliance program Bingham was severely rebuked, and Neubauer was advised by company counsel not to raise prices on any products for at least six months.

There is no evidence of the purpose of the meeting which Bingham attended, or any evidence from which the Court can find or infer that the meeting in any way influenced the 1960 chlorine increase by Columbia-Southern.

(109) There is no sufficient or persuasive evidence that, in connection with the list price increases referred to in Findings 97, and 98, 99 and 104, supra, there was any agreement or understanding between FMC and any other producer or producers, or any commitment or assurance given by one to another; or that the list price increases were the result of other than independently determined business decisions by Pennsalt and Columbia-Southern in making the announcement and those who followed with similar announcements.

## L. FREIGHT EQUALIZATION AND EVENTS RELATING TO GAF'S NEW CHLORINE CAUSTIC SODA PRODUCING PLANT AT LINDEN, NEW JERSEY.

(110) Like many other bulk commodities the chlor-alkali products are usually

5. GX–22.

sold F.O.B. production plant, with the customer paying the cost of freight to its plant. Because of the geographical distribution of the various producing points, those producers located nearest to potential customers enjoy a natural competitive advantage over producers located further away since the total delivered cost to customers (product plus freight) on an ordinary F.O.B. basis would be lower from the former locations. Therefore, to be able to compete effectively for customers outside their natural marketing areas, producers must "equalize" freight costs by absorbing freight costs in excess of those charged from the producing point nearest the customer so that their total delivered price is at least equal to that charged by the latter producer. Thus each chlor-alkali producing plant making substantial merchant sales is considered an equalization point by its competitors for the purpose of quoting delivered prices to customers in its area.

(111) On or about the early 1950's, rumors were circulating through the chlor-alkali industry that General Aniline & Film Corporation (GAF) was contemplating building a plant for the electrolytic production of chlorine and caustic soda at Linden, New Jersey. The plant was primarily to serve GAF's captive needs of the products involved but there was in prospect the sale of surplus products as merchant sales in competition with other producers. Linden was much nearer to the large New York City market than the then recognized equalization points of Allied's plant at Syracuse, New York, and Diamond's plant at Edgewood, Maryland. This was a matter of some interest, and possible concern to other chlor-alkali producers, for if the proposed plant at Linden produced significant amounts of chlorina and caustic soda beyond captive needs, for merchant sales, Linden would have to be recognized as an equalization point and the chlor-alkali producers would be required to absorb more freight on shipments to customers in areas which would be affected by the

Linden rate, thus costing these companies a substantial amount of money. These areas included New England, metropolitan New York City, Eastern New York State, New Jersey and Eastern Pennsylvania.

(112) In or about 1950, W. Wolcott Hooker, Vice-President of Hooker, hosted a luncheon at the University Club in New York City, attended by several officials of competing chlor-alkali producers. Louis Neuberg, at the time Sales Manager of FMC, or its subsidiary, Westvaco Chemical Company, was present at the gathering. Also present, among others, were Coey of Hooker, Madden and Stauffer of Stauffer Chemical Co., and Galliher of Columbia-Southern. The purpose of the luncheon meeting was to explore the factual basis for the rumors relating to GAF's new plant and to exchange information as to its possible capacity, how much of its production would be for captive uses, and how much available for merchant sales, to enable the companies represented by those present to decide whether Linden, New Jersey would have to be recognized as an equalization point for sales in its effective market area. The information available at that time, generally rumor, was too inconclusive to form the basis of any decisions on Linden.

(113) By the Spring of 1954, GAF's plans to build a plant at Linden were still in the planning stages. To achieve economics of scale GAF planned to build a plant in excess of its immediate captive needs. Learning this, several chlor-alkali producers including Columbia-Southern, Hooker, Mathieson and Penn-salt offered to purchase any excess production from GAF's proposed facility. These offers were motivated at least in part by the desire to eliminate Linden as a potential freight equalization point which would cause them to absorb additional freight costs.

(114) Joseph Madden was hired in 1954 as Sales Manager of Heavy Chemicals to direct the sale of GAF's excess caustic soda and chlorine production at

the Linden plant. GAF officials, as a result of discussions with competing producers, were anxious not to upset the existing equalization points, so Madden's marketing plan was basically to ease his relatively small additional supply into the market in such a way that he could charge delivered prices equal to the laid-in cost of customers in the area when purchasing from other suppliers, which was based on the equalization of freight from Syracuse, New York, or Edgewood, Maryland, the nearest major producing points.

(115) Beginning in 1954, Madden met with representatives of the other major chlor-alkali producers including FMC, usually on an individual basis, and informed them that since the Linden facility was not a major market factor, when it began production, GAF did not intend to sell chlorine and caustic soda on an F.O.B. Linden basis, but would use the then existing equalization points. Madden took this action because he did not want Linden recognized as an equalization point, thereby reducing the delivered price level at which Madden could sell the Linden output. The representatives of the other chlor-alkali producers, including FMC, recognized this and indicated to Madden that they did not intend to recognize Linden.

(116) When Linden "came on stream" in 1956, no producer recognized it as an equalization point for chlorine or caustic soda, and GAF followed the established equalization points of Syracuse and Edgewood, Maryland. In the course of time, GAF however began making deliveries in the New York City area at delivered prices lower than this. Moreover, by July of 1960, GAF had begun to tell its customers of its plans to expand the capacity of the Linden facility, and by November 1, 1960, rumors of this expansion had reached at least P&G. In response to news of GAF's plans for expansion, Columbia-Southern on November 1, 1960, publicly announced that it would recognize Linden, New Jersey as an equalization point for caustic soda.

Other producers followed suit. In 1962, Linden was also recognized as an equalization point for chlorine.

(117) Immediately after Linden, New Jersey was recognized as an equalization point in November of 1960, there existed some uncertainty among some chlor-alkali producers as to which tank truck rates to use in the quotation of delivered prices to customers located in the northern New Jersey area. Producers who formerly equalized on the basis of rail freight from Syracuse had to determine which tank truck carriers rates to use as the new basis for computing equalization to such customers. There were no statewide uniform truck tariffs in New Jersey since intrastate hauls were not regulated by the state, and there were approximately thirty trucking companies from which to choose. GAF, as a New Jersey producer had been using the services of truckers who belonged to the New Jersey Tank Truck Carriers Conference, which Conference published their rates—although not required by New Jersey law to do so. Several other producers had established terminals in the New York City area for the storage of products to be shipped to local customers, and thus were familiar with northern New Jersey trucking rates. However, Allied and Diamond, which had (except for Linden) the producing facilities nearest to New York were shipping directly from Syracuse, New York and Edgewood, Maryland, respectively, and therefore lacked information concerning freight charges of local truckers already used by those competitors which had local terminals.

(118) Between November 1 and 15, 1960, officials at Allied and Diamond called John Sondey, General Traffic Manager at GAF, seeking information as to the truckers used by GAF. Sondey gave them the name of the New Jersey Tank Truck Carriers Conference, and informed them where its published tariffs could be obtained. This was not an isolated occurrence in the industry since some competing chlor-alkali producers, including FMC, had on occasions

in the past and afterwards exchanged freight rates, including difficult to obtain intrastate freight rates, in order to make delivered prices "competitive."[6]

(119) On November 15, 1960, shortly after Linden's recognition as an equalization point, the Sales Department of GAF, by memo, requested the Traffic Department to continue to use the published tariffs of the Tank Carriers Conference when making prepaid shipments of liquid caustic soda to customers, as their use by GAF would be in compliance with "the policy as set forth by the chlor-alkali producers." The memorandum, signed by Calvert, the Assistant Sales Manager of GAF, also suggested that Sondey confer with his counterparts at Columbia-Southern, Allied, Hooker, Wyandotte, "etc.", to discuss the situation since GAF wanted to do everything within its power "to maintain a stable tank wagon price structure in North Jersey."

(120) There was additional correspondence between the traffic department of GAF and Diamond in December, 1960, in which information concerning trucking rates in northern New Jersey and from Diamond's plant at Edgewood, Maryland to the New York area were exchanged, and which (drawing the most reasonable inferences) indicated an attempt by these companies to maintain a stable price structure in northern New Jersey, by quoting identical delivered prices.

(121) By the end of November, 1960, other major chlor-alkali producers, including FMC, were following the New Jersey Tank Truck Carriers rates. A factor considered pertinent by at least some producers in using Conference, in addition to its published rates, was that its members were considered to be generally more safe and reliable than the so-called "gypsies" or independent truckers, with whom lower contract terms could possibly be negotiated.[7]

(122) In 1960, there was considered to be an instability in freight rates in northern New Jersey due to the use by some producers of unpublished rates, and the chlor-alkali competitors were experiencing difficulty in quoting uniform prices.

On July 28, 1960, Joseph Madden, who had left GAF and was now Marketing Manager of Stauffer Chemical Company, held a meeting, attended by representatives of several competing chlor-alkali producers, in his room at the Barclay Hotel in New York City. FMC was represented at this meeting by Jack Richards, Assistant Sales Manager of the Chlor-Alkali Division. Also present, among others, were George Grogan of Pennsalt, Mel Thompson of Wyandotte, Thomas Becnel of Dow, and James Ferris of Hooker. Madden had invited those present to discuss the market situation in northern New Jersey, particularly the freight rates of intrastate tank truckers. At this time, Stauffer was shipping liquid caustic soda by rail from its plant at Niagara Falls into the New York area, but because of inroads made by tank truckers, was finding it difficult to do so on a competitive price basis and still have a satisfactory net return. Therefore, Stauffer considered building a storage terminal in northern New Jersey, from which it would make deliveries of caustic to customers in the New York City area.

There was discussion at the meeting of delivered prices in northern New Jersey; and unpublished intrastate freight rates were exchanged among those present to allow them to ascertain the lowest prices being quoted in the area, to enable them to determine whether their respective companies' delivered prices were competitive with those of other producers, and thereby stabilize prices. In a further effort to achieve stability, those present selected one particular rate to be used by their companies in quoting delivered prices to customers. On the basis

---

6. GX–75, GX–76, GX–78, GX–90, GX–91.

7. See: GX–60, GX–62, GX–64, GX–65, GX–67, GX–69.

of the information he received, Madden concluded that building and operating a storage terminal in northern New Jersey was not economically feasible.

## M. DISCUSSIONS RELATING TO SHIPMENT OF CAUSTIC SODA BY BARGE.

(123) In or about the fall of 1955, there was a meeting of chlor-alkali industry executives at the St. Clair Inn in St. Clair, Michigan, followed by a tour of the Wyandotte laboratories at Wyandotte, Michigan. Present at the meeting were Coey and Wilkin of Hooker, Cremers and Scott of Wyandotte, Weed and Bates of Allied, Drummond and Logan of Olin, and Wildes of Dow, among others. There is no evidence, beyond speculation, that anyone from FMC was present at this gathering.

(124) In the year prior to the occasions referred to in Finding 123, Hooker had begun making barge shipments of liquid caustic soda to about half of the ten or twelve large users in the New York metropolitan area which had facilities to handle barge deliveries. Wyandotte had previously been shipping barge loads of caustic into the New York area but for only one customer, so Hooker's offer of barge quantities to all consumers who were large enough to take such loads was a competitive innovation. Hooker's barge customers paid fifty cents (50¢) less per ton for the barge delivered caustic soda and enjoyed the advantage of the lesser cost of barging compared with rail freight. When lighters (250 ton barges) were used in New York harbor, a "lighterage fee" was added to the barge delivered price.

(125) At the meeting referred to in Finding 123, supra, Coey gave to the others present detailed information about Hooker's barge shipments, and the group discussed Hooker's definition of a barge, and the details of how barge deliveries were being made. The "definition of a barge" involved the "lighterage fee" referred to in Finding 124, and the question of whether a customer receiving shipments by the 250 ton lighter should enjoy the same price differential enjoyed by customers receiving shipments by the 1250 ton barge, by the producer's absorbing the lighterage fee, or whether the fee should be passed on to the customer as was already being done by Hooker. Those present arrived at a definition of what a barge load consisted of, and reached a consensus that a lighter should not be considered a barge for purposes of the barge-freight differential.

(126) Hooker informed its competitors of the details of its barge deliveries to caustic soda customers at the meeting at the St. Clair Inn to enable them to compete on an "even" basis if they responded to its innovation by making barge deliveries or otherwise matching the cost savings to customers. Hooker officials hoped that in reacting on the basis of knowledge rather than mere speculation, competitors would meet rather than beat Hooker's terms, and thereby prevent any marked price erosion.

(127) Following the meeting referred to in Findings 123, 125 and 126, most chlor-alkali producers followed Hooker's lead in the terms of barge shipments, although within the course of the next couple of years some other barges of different sizes were introduced.

(128) Shortly prior to November 4, 1957, Hooker called the FMC Traffic Department to advise FMC that, effective January 1, 1958, Hooker *would be* charging certain rates on shipments of liquid caustic soda in barge load quantities from its plants in Niagara Falls, New York, and Montague, Michigan, to New York harbor, Chicago, Illinois and Lamont, Illinois. It further informed FMC that minimum quantities qualifying for barge load shipments to New York would be 500 tons, and the minimum weight to the Chicago area would be 2500 tons solution basis. This information was relayed to Arthur Smith, FMC Sales Manager, by memo dated November 4, 1957. There is no evidence to indicate whether or not the calls were made to other chlor-alkali producers.

(129) The exchange of information relating to Hooker's deliveries of caustic soda by barge as in the later case of the exchange of unpublished freight rates and the decision of all of the chlor-alkali producers to quote the rates of the New Jersey Tank Carriers Conference was done pursuant to a common understanding and design among the chlor-alkali producers to exchange all freight information necessary for them to compete on an even price basis.

## III.

## DISCUSSION

The question presented for decision is whether on the facts as found by the Court, the conduct engaged in by the defendant, FMC, and its alleged co-conspirators during the period covered by the complaint constituted violations of Section 1 of the Sherman Antitrust Act.[8]

■ The government correctly argues that it is not necessary to prove the existence of an express agreement to fix prices to support its allegations. It is settled that:

"[N]o formal agreement is necessary to constitute an unlawful conspiracy. * * * The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in an exchange of words. * * * Where the circumstances are such to warrant a * * * finding that the conspirators had unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." American Tobacco Co. v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1139, 40 L.Ed. 1575 (1946).

Based upon that standard the Government sought to prove that there existed a "community of thought" and "a continuous line of communication" between FMC and its alleged co-conspirators during the period covered by the complaint which had as its objective the stabilization of prices and the elimination of price competition in the marketing of the several chlor-alkali products here involved; that this continuous course of communication enabled the conspirators to exchange price information and other relevant but difficult to obtain market intelligence so that they could quote "competitive" (i.e., identical) prices; and in essence generated confidence among them that pricing actions taken by any of the alleged conspirators would be supported by the others. At trial, the Government sought to support this argument by the presentation of testimonial and documentary evidence of industry meetings, informal discussions, written correspondence and telephone conversations participated in by responsible officials of the named alleged corporate conspirators, allegedly in furtherance of the conspiracy.

The defendant's rebuttal to the plaintiff's charges, essentially, is the contention that the elements of the conspiracy alleged—the "meetings, informal discussions, telephone calls and * * * correspondence"—are merely the necessary incidents of normal business conduct engaged in by men in the same general line of business and, absent proof of an agreement or a conscious commitment to some joint course of action, are insufficient bases upon which to establish proof of a conspiracy to violate the antitrust laws.

Though not to the extent alleged in the Government's complaint, I have concluded that there was ample probative evidence presented at trial to support the contention by the plaintiff that FMC and its erstwhile competitors engaged in concerted action to stabilize the price

8. Section 1 of the Sherman Act provides, in relevant part:
   "Every contract, combination in the form of trust or otherwise, or con-spiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

of chlor-alkali products during the period covered by the complaint.

The Government argued forcefully that the several incidents which it sought to establish as evidence of the conspiracy should not be viewed in isolation, but rather should be considered as "tiles in the mosaic of an over-all plan or conspiracy." And the Supreme Court has held that in cases involving alleged conspiracies in violation of the Sherman Act, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.' * * * [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). Nevertheless, because of the episodic nature of the incidents, separated in space and time; and the disparity of their respective elements, linked only by the cast of characters common to most of them; it is necessary to consider some of these incidents separately to define precisely the nature of the conspiracy.

With respect to several of the price increases involved—the general price increases of 1955 and 1956; the dry caustic increase of 1958, and the chlorine price increase of 1960—there was simply a lack of sufficient credible evidence to support a finding that FMC and its competitors conspired to increase chlor-alkali prices "jointly, concurrently and in unison" (Complaint, ¶ 23(a).). There were other reasonable explanations, absent agreement, to justify the contemporaneous and uniform price actions taken by all of the chlor-alkali producers. But there was ample evidence in the record to support a finding that FMC and its competitors engaged in a knowing course of conduct which had as its purpose and effect the stabilization of the price of caustic soda, and a concert of action to maintain an identical system of freight quotations.

However, before discussing the substantive issues involving the alleged conspiracy to fix prices, the Court must address itself to the problem adverted to in the Preliminary Statement of this Opinion—the question of the admissibility as substantive evidence in this case of portions of testimony given by a key government witness before two federal grand juries which investigated the chlor-alkali industry in 1961 and 1962.

## A. THE ADMISSIBILITY OF GRAND JURY TESTIMONY AS SUBSTANTIVE EVIDENCE.

In support of its allegations that FMC and its named co-conspirators arranged to establish their prices of chlor-alkali products "jointly, concurrently and in unison," the plaintiff relied heavily on the testimony of Arthur F. Smith, former sales manager of the Chlor-Alkali Division of FMC.

In testimony so vague and indecisive as to be unexplainable by the mere passage of time, Smith asserted that during the time in which he served as chlor-alkali sales manager, he discussed prices "collectively or individually" with certain officers and executives of other chlor-alkali producers whose names were suggested to him by counsel for the plaintiff; and that, although he had no specific recollection of any of the discussions, and was unable to recall the subject of these discussions, and had no particular recollection of the several price increases which occurred during his four years as sales manager, no price increase announcement that did occur ever came as a surprise to him. He testified that the source of his information "could" have been discussions and meetings and "probably" was acquired through conversations with competitors.

Because of Smith's apparent inability on either direct or cross-examination to recall material aspects of his alleged dealings with his counterparts at competing companies, counsel for both plaintiffs and defendant, after obtaining leave of the court, read to Smith portions

of his testimony before the grand juries. These attempts at refreshing the witness' recollection failed so plaintiff sought to have Smith's grand jury testimony considered as substantive evidence in the case at bar, contending that the testimony met all of the requisites for admission under the past recollection recorded exception to the hearsay rule, since the testimony was given under oath, in a setting calculated to impress the witness with the import of the oath, and because the witness asserted on the witness stand that, although he could not remember the events about which he testified before the grand jury, or even remember being asked the questions which he answered, he "recognized" the truth of his testimony.[9] The defendant objected to the admission of the testimony, arguing, inter alia, that even though Smith's grand jury testimony was given under oath, it was delivered without benefit of cross-examination, in a setting not conducive to a balanced presentation; and, that the passage of time effectively precluded the defendant from cross-examining Smith now because, not having any recollection of his testimony before the grand juries five and six years previously, Smith could not testify as to whether he might at least have been mistaken in any testimony before the grand juries about events which took place four to eight years prior to that, even though trying to tell the truth.[10]

9. At trial, the following colloquies occurred:
"THE COURT: Mr. Smith, what do you understand the question to mean when someone will ask you 'Does that refresh your memory?'
"THE WITNESS: I understand it to mean that he is asking him do I remember the specific event or details pertaining to the question.
"THE COURT: And when you say it doesn't refresh your memory, your statement means that despite having heard this testimony, it doesn't aid you in recalling any aspect of the question, or the area in which the question was phrased.
"THE WITNESS: No. Not only does it not do that, I don't even remember the specific question being asked in the Grand Jury, Your Honor. That was about five years ago. The events we are talking about were eleven or twelve years ago, and I just don't remember the details, sir." (T., pp. 226–227.)
    *    *    *    *    *
"THE WITNESS: Your Honor, may I ask you a question?
"THE COURT: Yes.
"THE WITNESS: He used a statement, 'recognizes as the truth.' He asks me if this refreshes my memory and then he asks me if I recognize it as the truth. If I say yes, that I recognize it as the truth, does that infer that I remember it?
"THE COURT: I thought Mr. Piel went over that with you. What do you mean when you answer "yes" to the question? Do you recognize it as the truth?

"THE WITNESS: I assume that it is true. I mean I had no reason to tell anything other than the truth, but I may not remember it." (T., pp. 592–593.)

10. On cross-examination, counsel for the defendant sought to further clarify the nature of Smith's recognition of the truth of his grand jury testimony and the strength of his recollections before the grand jury, as follows:
"Q: Incidentally, Mr. Smith you did answer a number of questions that were asked by Mr. Neville in relation to Grand Jury material that was read to you. You were asked, do you recognize that to be the truth? Did you mean by that that at the time that you were testifying before the Grand Jury you were doing your best to tell the truth?
"A: Certainly.
"Q: Well, is that what you mean by saying you recognize it to be the truth?
"A: Certainly.
"Q: Is there—any other way to recognize it to be the truth?
"A: No, sir.
"Q: Might you have been mistaken in some of the things you said before the Grand Jury, even though trying to tell the truth?
"A: I suppose I could have been, but I don't know of any—
"Q: But if you don't remember today, you can't tell whether you were mistaken or not when it was read to you, can you?"
"A: No. That is correct." (T., pp. 234–235).

This court concurred with the contention by counsel for the defendant that inadequate safeguards existed to insure the accuracy and trustworthiness of the grand jury testimony and therefore denied its admission as substantive evidence.

A general rule in determining the admissibility of a writing as past recollection recorded is that the recollection when recorded must have been fairly fresh in the memory of the witness; or more commonly, must have been recorded "at or near the time of the events in question." Maxwell's Executor v. Wilkinson, 113 U.S. 656, 658, 5 S.Ct. 691, [28 L.Ed. 1037] (1885); Wolcher v. United States, 200 F.2d 493, 496 (9th Cir., 1952); McCormick on Evidence, § 277 (1954); 3 Wigmore on Evidence, § 745 (1944 Ed.) The rationale for this rule is to insure the trustworthiness of the writing embodying the recollection by requiring that it must have been clearly and accurately remembered by the witness at the time of the making of the writing, since the validity of the content of the writing is ordinarily not subject to "the test of Cross Examination 'on which our law places primary reliance for the ascertainment of truth'." Wigmore, supra.[11] While there is no inflexible criterion for determining when a writing is so

remote from the events described therein as to be inadmissible as past recollection recorded (c. f. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 236, 60 S.Ct. 811, 850, 84 L.Ed. 1129 (1940)), the recurring inability of Smith to recall material aspects of his alleged dealings with his counterparts in the industry before the grand jury as well as at trial was particularly disturbing. Thus, the Court held that the events testified about were too remote from Smith's appearances before the grand jury to justify admitting the grand jury transcript of Smith's testimony as substantive evidence.[12] For this reason the cases primarily relied on by the plaintiff, United States v. DeSisto, 329 F.2d 929 (2d Cir. 1964), cert. den. 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), and United States v. Barrow, 229 F.Supp. 722 (E.D. Pa., 1964), aff'd 363 F.2d 62 (3rd Cir. 1966), are clearly inapplicable. Though in the cases the trial courts did permit portions of witnesses' prior grand jury testimony to be introduced as substantive evidence in the case in chief, in both cases the testimony before the grand jury was reasonably near to the events in question, and in each case the witnesses were reasonably able to testify on present recollection about the subject of the grand jury inquiry. In *DeSisto,* the transcript was initially in-

11. "In order that the past recollection may be one worth trusting, it must have been sufficiently fresh and vivid to be probably accurate. When a present recollection is used, it may be sufficient * * * to admit an 'impression', or a 'belief' * * *. But where the witness goes back to a past recollection, which can less easily be tested by cross-examination, he may properly be asked for something more positive—something of a quality satisfactory in itself and not merely the best available." 3 Wigmore, § 745, pp. 78–79 (1944 Ed.)

12. The basis for that concern is well stated in United States v. Riccardi, 174 F.2d 883, 887–888 (3rd Cir. 1949) where the court, in discussing the standards to be applied in determining the admissibility of evidence as past recollection recorded, noted that:

"Whether the record is directly admitted into evidence, or indirectly by the permissive parroting of the witness, it is nevertheless a substitute for his memory and is offered for the truth of its contents. It assumes a distinct significance as an independent probative force, and is therefore ordinarily required to meet certain standards. *These requirements are the more understandable in consideration of the fact that the court is at once desirous of determining whether the writing may be safely received as a substitute for the witness' memory and for the truth of the matter therein asserted, and of affording the trier of the fact information upon which it can form a reliable judgment as to its worth for the purposes offered.*" (Emphasis added.)

troduced as evidence of prior inconsistent statements by the witness, then was considered as substantive evidence. In *Barrow,* the grand jury testimony was introduced to refresh the recollection of a seemingly hostile witness, and was admitted as substantive evidence only in the "few instances" in which the witness' recollection was not refreshed; there was no attempt, as here, to make wholesale substitutions of prior testimony for present recollection. Thus, in both cases there existed adequate safeguards, not present here, to insure the probable accuracy of the testimony.[13]

This ruling finds support in the recent decision of the Court of Appeals for the Third Circuit, in United States v. Schwartz, 390 F.2d 1 (3rd Cir. 1968). There the Court held that it was error for the trial court to admit into evidence a statement by the appellants previously convicted codefendant which implicated the appellant in the criminal conduct charged. Though that case differs from this case in that there, unlike here, the hearsay statement was not given under oath, that was only one of several factors considered by the court to detract from the probable reliability of the statement. Other factors considered equally important were the fact that the statement was made over seven years after the events described therein, it was given in an "obvious" effort to obtain a lighter sentence, and there was no opportunity to cross-examine the witness on the contents of the statement. Thus, the case demonstrates the care which should be exercised by the trial court in admitting into evidence hearsay testimony considered lacking in sufficient extrinsic safeguards of trustworthiness.

However, for the purpose of providing a complete record on appeal, the Court made an additional finding based on the excluded testimony; and even were Smith's grand jury testimony received in evidence, the Court's ultimate conclusions would remain unchanged. Some portions of Smith's testimony before the grand juries was characterized by the same vagueness (though to a lesser degree) as was true at trial; the testimony was general, almost hypothetical in nature, uncertain as to names and events, and in general not of a quality sufficient to support a charge of an unlawful conspiracy in violation of the antitrust laws.

## B. THE ALLEGED CONSPIRACY TO INCREASE THE CHLOR-ALKALI PRICES.

### 1. *The 1955 and 1956 Price Increases.*

There was insufficient credible evidence presented at trial to support a finding that FMC and its competitors conspired to increase the prices of chlorine, caustic soda and soda ash in 1955 and 1956, "jointly, concurrently and in unison" (Complaint, ¶ 23(a)–(d)). That portion of the plaintiff's case rested solely upon the testimony of Arthur F. Smith and inferences drawn therefrom, together with the acknowledged uniformity of the list prices of the chlor-alkali products by all producers and the contemporaneous announcements of the price increases by all of the competitors.

As was noted in the preceding section, the testimony by Arthur Smith that no price increase occurring in the chlor-alkali industry while he was a sales manager for FMC ever came as a surprise to him, and that he "could" have obtained this information through conversations with competitors, is an insufficient basis upon which to rest proof of a conspiracy to fix prices in violation of Section 1. This is particularly true since Smith also testified that he could not even remember the price increases in question, nor recollect the general circumstances under which he could have acquired prior knowledge about them. If there had been frequent price increases during that four year period, a failure to recollect any partic-

---

13. In addition, the Court in DeSisto emphasized that the accuracy of the wit-

ness' grand jury testimony had been tested by cross-examination at a prior trial.

ular increase might be understandable, and compensated for by testimony that discussions and conversations with competitors leading up to price increases were so repetitive or recurrent as to amount to invariable custom. But there were only three price increases during the four years in which Arthur Smith was sales manager for FMC: the general price increases in 1955 and 1956, and the dry caustic soda price increase of 1958, about which Smith had somewhat more of a recollection. Thus, apart from the problem of attempting to fill in the gaps in Smith's testimony with appropriate inferences there is the more serious problems of credibility which his testimony raised.

In addition, there was testimony and documentary evidence at trial, showing the means by which knowledge or speculation of impending price increases could be rife in the industry and in the trade journals prior to the official announcement, absent discussions between competitors.[14]

As to the uniformity of list prices of the chlor-alkali products among the several chlor-alkali producers, and the close proximity of the respective price increase announcements, there was other credible evidence which tend to explain such phenomena. Expert testimony at trial[15] established that in a commodity market in which the products are basically homogeneous (i. e., each identical with its counterpart within a particular grade or category), as in the case in the chlor-alkali industry (Finding 12), list prices will usually be identical within a given freight zone. This tendency toward list price uniformity is even more likely where the principal market for these homogeneous products is as raw or intermediate materials in the production of other products (Finding 14), sold to large industrial users (Finding 15), having two or more suppliers of the same product (Finding 16) under long term contracts containing "price notification" and "price protection" clauses (Finding 15), and represented in sales transactions by skilled and informed purchasing agents (Finding 16); because under these conditions due to the relative inelasticity of demand for the products a lower price will not increase the size of the total market; no producer can successfully sell at a higher price than its competitors; and if a seller attempts to sell at a lower price than its competitors other than by secret discount by virtue of the price notification and price protection clauses of the contract, its competitors will be given the opportunity to meet its lower price, thereby resulting in uniform prices again, but at a lower level; and without any increase in the original seller's net share of the market.

The fact that the announcement of a price increase by the producer initiating it was quickly followed by its competitors can also be explained other than by finding a conspiracy to raise prices jointly. For under the customary long term contracts by which the bulk of chlor-alkali products are sold, price increases may be announced effective only at the end of calendar quarters. Thus producers who desired to meet a price increase announced by a competitor had only a short period of time in which to react by announcing their own price increases.[16] This indicates that there is a significant amount of consciously parallel behavior in the industry since producers respond directly to price movements by their competitors in a market where a "meet but not beat" philosophy prevails; but as the Supreme Court admonished in Theatre Enterprises v. Paramount Film Distributing Corp., 346

---

14. Bachman, Transcript, pp. 1625–1626; FX–54; Items 38, 48, 50B, 74A and 75B; 84; GX–24.

15. Testimony of Dr. Jules Bachman, Prof. of Economics, N.Y.U. Tr. 1619–1626.

16. The evidence shows that the price increase announcements of 1955 and 1956 were made at or about the end of the third quarter (in August and September) of both years.

U.S. 537, 540–541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954):

"To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. * * * But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense."

And, in another Sherman Act case, where prime reliance was placed upon the fact of uniform prices, the court noted that:

"[S]imilarity of prices in the sale of standardized products such as the types of steel involved in this suit will not alone make out a prima facie case of collusive price fixing in violation of the Sherman Act, the reason being that competition will ordinarily cause one producer to charge about the same price that is charged by any other." Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 665 (9th Cir., 1963), cert. den., 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

Thus, proof of an agreement, express or implied, is essential to proving a conspiracy in violation of Section 1 of the Sherman Act. Here there was no other evidence either by testimony or documents from which to infer that there existed any agreement on the part of any of the chlor-alkali producers to jointly raise prices.

### 2. *The 1958 Dry Caustic Increase*

Much of the same infirmity affecting the plaintiff's proof of conspiracy with respect to the 1955 and 1956 chlor-alkali price increases is true also of the 1958 dry caustic soda price increase. Here also the plaintiff's proof rests largely upon the testimony of Arthur F. Smith; and though his testimony regarding this incident was somewhat more complete than his testimony regarding the earlier price increases, his general demeanor and performance as a witness was so questionable that the Court must decline to make any affirmative findings or conclusions from his testimony alone. There was, however, testimony from others which in some instances contradicted and in other instances reinforced testimony by Smith. Thus there is credible evidence that Smith was a staunch advocate of the view that the price of dry caustic soda inadequately reflected the added costs of producing it from liquid caustic and should be increased $10.00 per ton; and that he expressed this view both within his company and to officials of competing companies. There is also evidence that he felt that a substantial increase in the price of dry caustic would not succeed unless supported by all of the major producers, and that he therefore sought the concurrence of competing producers in making such a price increase for a number of months (Finding 49). There is no evidence that there was a particular meeting devoted to discussion of the feasibility of a $10.00 per ton dry caustic price increase, and Smith conceded that he had no assurances or agreement that FMC's competitors would support a price increase announced by FMC. He "thought" that others would follow FMC's lead; this was based on "conviction or hope" (N.T., pp. 134–36); but in his words, "I don't recall anyone ever saying that they would support me" (N.T., p. 422). Thus, at best the evidence shows that Smith solicited others to join him in a conspiracy to fix prices in violation of the antitrust laws; but, apart from the increase itself there is no evidence that this solicitation was accepted. Indeed the evidence shows that on several occasions Smith was rebuked by officials from competing firms for attempting to discuss prices and that at least one company complained to Smith's superiors about his improper advances.[17] And though the

---

17. Findings 53, 55; Testimony of Prutton, FMC Executive Vice-President and Chemicals Division; T., pp. 1739, 1741–42, 1778–81.

fact that all other chlor-alkali producers matched FMC's price increase could permit an inference of conspiracy, in the absence of other satisfactory evidence it is equally permissible to infer that, recognizing the same economic facts about dry caustic as did Smith, the other producers increased their prices shortly after FMC's initiation of the increase to realize increased revenues on a high cost-low profit item, while allowing FMC to bear the brunt of customer displeasure.

Thus, on the evidence considered as a whole, the Court concludes that there is insufficient credible evidence to support a finding or inference that there existed between FMC and its competitors any agreement or conscious commitment to a concerted course of action resulting in the 1958 dry caustic soda price increase.

### 3. *The 1960 Chlorine Price Increase*

The plaintiff sought to support its allegation that the chlorine price increase announced by all of the chlor-alkali manufacturers in February and March, 1960, was arrived at jointly and conspiratorially by inference from incidents such as the Old Club gathering in June, 1958; isolated contacts between Neubauer, then President of Columbia-Southern, and Ballman, a Vice-President of Dow, in 1958; and the continuing contact between representatives of the alleged co-conspirators by means of the post-Advisory Committee gatherings at the Barclay Hotel in New York City. The plaintiff urges that, if not evidence of an express agreement among competitors to raise the price of chlorine, these contacts and communications "established a meeting of the minds that an increase was in order without more," leaving the eventual price to be determined by jockeying in the market. But, on the facts as found by the Court, there is insufficient credible evidence from which to find that the chlorine price increase of 1960 was the product of an agreement, express or implied, or derived from a conscious commitment to a joint course of action.

The evidence adduced at trial does demonstrate to the satisfaction of the Court that within both Pennsalt and Columbia-Southern independent examination of relevant market facts preceded their respective increase announcements, and tends to negate the probability that the price increases were arrived at by agreement among the alleged co-conspirators (Findings 100, 102).

The next between meetings, such as that at the Old Club, and two fleeting encounters between individual competitors, all occurring in 1958, and the ultimate price increases in 1960 are too tenuous to permit the inference of a causal relationship. In the latter instances the substance of the conversations consisted of casual suggestions made to Neubauer by Ballman, that Columbia-Southern ought to raise the price of chlorine, suggestions that were immediately rebuffed by Neubauer in accordance with Columbia-Southern's strict policy of not discussing prices with competitors or being present in gatherings where prices might be discussed. In the former situation, the gathering at the Old Club on Harsen's Island, Michigan, there was conflicting testimony as to the substance of the presentation made by Cremers, apart from the fact that it pertained primarily to the inter-relationship between caustic soda and soda ash, and conveyed an implied suggestion that prices on these products were insufficient and should be increased. The one witness who could have testified most directly about the purpose of the gathering, its host, Bert Cremers of Wyandotte, was not called by either party ostensibly on the ground that he was in poor health and unable to undergo the rigors of trial. The Court granted the parties the option of taking Cremers' deposition, but the offer was not accepted. But, in the absence of Cremers' testimony, and in light of the conflicting interpretations by witnesses at trial,

inferences as to the purposes and intent of his presentation at the Old Club are pure speculation. This is true not only with reference to the Old Club gathering, but is also true of the later alleged meeting in 1958 in Pittsburgh between Cremers and Bingham (now deceased) of Columbia-Southern at which Cremers allegedly sought to persuade Columbia-Southern to support the industry in a chlorine price increase. The plaintiff sought to infer the meeting from an entry in Bingham's calendar diary noting a future meeting with Cremers; and a subsequent inter-office memo by Cremers expressing his own "keen disappointment" at being unable to effect a price increase in chlorine because of the existing "market situation". But there is no evidence as to whether the meeting ever took place, nor of its purpose or substance; nor is there any logical basis on which to infer that the later memo referred to the outcome of that meeting. Cremers could have supplied such testimony, the testimony was not presented in any form, and since the plaintiff had the burden of proving its allegations, in the absence of sufficient supporting evidence the Court declines to draw the inferences urged by the plaintiff from Cremers' activities.

The gatherings after the Advisory Committee meetings pose a more serious question. The United States Supreme Court recently held in United States v. Container Corporation of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (Jan. 14, 1969), that the systematic exchange of price information by competitors pursuant to an understanding or agreement that such information will be exchanged whenever requested, and the use of such information to stabilize prices, constitutes an unlawful conspiracy and per se violation of Section 1 of the Sherman Act. The evidence of this case shows that among other things price information was exchanged at these gatherings; that there was discussion about the general agreement on the need for higher prices for chlor-

ine, and generally supports an inference that the gatherings were essentially used for the purpose of stabilizing the chlor-alkali market by providing a medium for the exchange of sufficient information to enable the competitors to compete on an even price basis.

*But on the specific question of the 1960 chlorine price increase* the evidence concerning the Advisory Committee meetings does not support an inference that the information exchanged provided the basis for, or was causally related to the ultimate price increase.

In arguing by anology from the recent *Container Corporation* case, it is well to keep in mind the admonition of the United States Supreme Court in Maple Flooring Manufacturing Ass'n v. United States, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1925) that "each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record" and that prior opinions in such cases "must be read in light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of the earlier decisions is to be applied." In *Container*, the basic product, corrugated containers, though of a homogeneous nature was manufactured in a wide variety of products made to the specifications of customers and sold on a short term or spot basis rather than through long term contracts; prices were individually negotiated between buyers and sellers based on a variety of cost factors rather than from a fixed list price; and customers shifted their purchases among suppliers depending upon the most favorable price terms quoted to them. Therefore, in competing for customers it was necessary for competitors to know the specific price alternatives available to customers, or most recent prices quoted to a specific customer for a like order. For this reason, most recent price information obtained by agreement from competitors, when not available from other sources, was in-

evitably used as a basis for quoting prices to customers, either by quoting the same price or undercutting it. In the chlor-alkali industry, as noted in the Findings of Fact 12, 15, 18 and 19, Chlorine is a homogeneous product sold from a uniform published list price rather rigidly adhered to by all of the producers except for some off-list price selling, usually confidentially negotiated, and under long term contracts. Under these market conditions · there are no rapidly changing price levels, and no need for continuous exchanges of information on prices recently quoted to specific customers. The evidence indicates that discussions among competitors at the gatherings following Advisory Committee meetings, as they pertained to chlorine, focused more on costs than on the price of chlorine, and reflected a general feeling among the companies represented that there existed a cost-price squeeze necessitating an eventual price increase. This information was of a type not substantially any different from that found in the industry trade journals. It may be true as the plaintiff contends that these gatherings and discussions allowed the chlor-alkali producers to predict the reactions and responses of their competitors to any prospective price increase which they contemplated; but this merely proves that possible competitor reaction was another economic reality which each producer had to consider in addition to costs and profit margins, in determining the feasibility of a price increase.

## C. NATURE OF CONSPIRACY

1. *The Stabilization of The Price of Caustic Soda.*

As the preceding discussion indicates, there was simply a lack of credible evidence with respect to the events surrounding the several price increase announcements to reasonably support any inferences of agreement between the alleged co-conspirators. And, as Judge Medina observed in United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y., 1953):

> "When all is said and done, it is the true and ultimate fact which must prevail. Either there is some agreement, combination or conspiracy or there is not. The answer must not be found in some crystal ball or vaguely sensed by some process of intuition, based upon a chance phrase used here or there, but in the evidence adduced in the record of the case which must be carefully sifted, weighed and considered in its every aspect." (118 F.Supp. at p. 634.)

However, the court concludes that there was sufficient evidence presented to support the allegations that FMC and its alleged co-conspirators engaged in a course of conduct during the period covered by the complaint which had as its purpose and effect, the stabilization of the price of caustic soda in violation of Section 1 of the Sherman Antitrust Act.

The nature of the agreement between the chlor-alkali competitors was to exchange the information necessary to eliminate any gaps in knowledge or disparity in practice which might detract from the goal of maintaining a stable rather than a deteriorating price for caustic soda, which was in chronic long supply during the period covered by the complaint. Thus, whenever there was a departure from the uniform pricing, of caustic soda, such as limited discounts to a class of users—the P & G discount in 1958 and the Tyrex discount in 1960; or a change in the manner of delivery—the 1954 creation of a barge-freight rate; the creation of additional equalization points—GAF's Linden, New Jersey plant; and the selection of a uniform system for quoting unpublished tank truck rates, representatives of the chlor-alkali producers met, exchanged information and sought, directly or by implication, to achieve a concert of action.

Counsel for the defendant continually advanced the proposition that the dis-

cussions and communications between ostensibly competing producers, which the evidence adequately shows, were not engaged in for the purpose of obtaining "agreement" or a "meeting of the minds" upon actions to take or refrain from taking in the interest of maintaining price stability in the chlor-alkali market; but rather were engaged in so that the independently determined pricing actions of these producers would be based upon full market intelligence—including exact knowledge of what their competitors were doing—rather than upon guess, pure speculation, or incomplete or misleading information. In this regard, it relies upon those cases in which the Supreme Court held that within the context of a trade association, exchanges of certain information between competitors, absent proof of some agreement, did not violate the antitrust laws. Maple Flooring Manufacturing Association v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); Cement Mfgrs. Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925).

Then, somewhat inconsistently the defendant argued that the information exchanged was not anything which could not be gleaned from trade journals, or conversations with buyer purchasing agents shortly after any change in pricing by a producer. If this is so, the question arises why was it necessary to exchange this information at the meetings which occurred? The answer: Apart from the facts that there was no evidence at trial that selective price discounts as opposed to list price increases or decreases were published in industry trade journals or were otherwise matters of precise common knowledge immediately upon their occurrence, and that there was evidence that barge and intra-state truck rates were not always published, the producers apparently did not consider indirect methods of communication precise enough to insure that they all would know the exact nature of the transactions. The defendant would have the court find that it

was purely fortuitous that Olin announced its price discount to the Tyrex industry on a day when the Advisory Committee of the Chlorine Institute was meeting in New York; that it was merely incidental that a meeting of industry sales executives coincided with FMC's consummation of its caustic soda deal with P&G in June, 1958; that the gathering of industry executives at the St. Clair Inn in 1954 just happened to occur shortly after Hooker's competitive innovation in the means of delivering caustic soda by barge in the New York area; and that there are no adverse inferences to be drawn from the series of meetings which Madden of GAF held with the Chlor-Alkali producers and their concommitant refusal to recognize Linden as an equalization point; or from the meetings in New York and communications between the traffic departments of the competitors by which unpublished freight rates were exchanged and an agreement reached to quote a common trucking freight rate. However, it is conceded by the defendant that the intent of the men who imparted the information was to obtain adherence by the other companies; this was understood by the others present at the meetings who also recognized that by virtue of the pricing structure under which they all operated prices would ultimately have to be uniform; and their companies then established their prices on this basis of the information imparted. The fact that the information *might* have been available through other means is irrelevant, since it was the agreed exchanges of information which were acted upon by the chlor-alkali producers to restrain trade which constitutes the proscribed conduct. (See Morton Salt Co. v. United States, 235 F.2d 573, 576 (10th Cir., 1956)). Thus, the cases relied upon by the defendant are inapposite, for in evaluating the facts of this case they are clearly distinguishable from the conduct approved of in Maple Flooring and Cement Mfgrs., *supra*.

In *Maple Flooring,* there was involved a trade association composed of the corporate defendants, which had a system of periodic reporting by its members of costs of production of its products; a freight rate booklet compiled and distributed among its members showing freight rates on flooring to and from 6,000 odd points of shipment in the United States; statistics which were supplied by each member to the Secretary and were disseminated to the other members, showing products, the prices received and inventory; and meetings at which representatives of the member firms met and exchanged views as to problems of the industry. The court found that the government had neither alleged nor proved that there was any agreement or understanding between the defendants either affecting production, fixing prices or for price maintenance, it merely contended that such results were the necessary consequences of the defendants' activities. With the case in that posture and acknowledging that exchanges of information might tend to stabilize prices, the court stated:

> "We decide only that trade associations or combinations of persons or corporations which openly and fairly gather and disseminate information as to the cost of their product, the volume of production, the actual price which the product has brought in past transactions, stocks of merchandise on hand, approximate costs of transportation from the principal point of shipment to the points of consumption as did these defendants and who, as they did, meet and discuss such information and statistics without however reaching or attempting to reach any agreement or any concerted action with respect to prices or production or restraining competition, do not thereby engage in unlawful restraint of commerce."

In *Cement Mfgrs. Protective Ass'n, supra,* as in *Maple Flooring, supra,* the corporate defendants were members of a trade association which engaged in the gathering and dissemination of cost and price statistics, compiled a freight rate book, held periodic meetings at which industry problems were discussed and in addition gathered and disseminated information in connection with specific job contracts between its members and purchasers. Here also the government neither alleged or proved any agreement by the defendants placing limitations on either prices or production. On these facts the court held that:

> "[T]his record wholly fails to establish, either directly or by inference, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement to which we have referred, and it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action.

> "For reasons stated in United States v. Maple Flooring Association, supra, such activities are not in themselves unlawful restraints upon commerce and are not prohibited by the Sherman Act." (268 U.S. 588, at p. 606, 45 S.Ct. 586, at p. 592).

However, even in these cases, on which the defendant relies, the court admonished that:

> "Agreements or understanding among competitors for the maintenance of uniform prices are, of course, unlawful and may be enjoined * * * [and] * * * *an artificial price level not related to supply and demand of a given commodity may be evidence from which such agreement or understanding or some concerted action of sellers operating to restrain commerce may be inferred."* (Cement Mfgrs. Protective Ass'n, 268 U.S. at p. 606, 45 S.Ct. at p 592).

In this case there were not the relatively routine and systematic exchanges of statistical information or the preparation of freight rate books containing official published tariffs, as existed in

---

**1146**

*Maple Flooring, supra,* and *Cement Manufacturers Protective Ass'n, supra*; nor did it involve the frequent, informal communication of most recent price quotations to specific customers by competing firms as was found in United States v. Container Corporation, *supra.* These meetings and exchanges of information consistent with the marketing of chlor-alkali products occurred only when necessary to impart information concerning departures from the established list price of caustic soda or disparities in quoting freight rates which portended industry-wide repercussions if not controlled in their impact. They arose in the several specific situations hereinafter discussed when one of the chlor-alkali producers had granted a discount to a class of users, or changed the means of delivery or the method of computing the terms of delivery, and it was necessary for the competitors to know the precise extent of the discount, or the exact freight rate so that each could quote the same price to customers rather than possibly miscalculate the scope of the price change or rely upon possibly erroneous or misleading information obtained from the purchasing agents for buyers, thereby precipitating a further price erosion. Thus there is ample support for a finding that these meetings and other types of communication were part of a common scheme or design and represented attempts on the part of FMC and other chlor-alkali manufacturers to achieve a concert of action with respect to prices.

The facts show that caustic soda was in chronically long supply during the period covered by the Complaint. As a co-product in the manufacture of chlorine by the electrolysis method, caustic soda production was in large part determined by the demand for chlorine, which generally exceeded the demand for caustic soda; therefore marketing the caustic soda produced was a recurring problem in the industry.[18] Since the demand for caustic soda was relatively inelastic it was in the interest of the chlor-alkali producers to maintain a high stable list price, for a list price decrease would not bring about an increase in demand for caustic soda; and discounts would not for the most part, lead to a permanently enhanced share of the market for any individual producer, if communicated to other suppliers because they would in turn be required by their customers to meet it, resulting in a lower general price for all, without any appreciable change in market shares. For this reason it was in the interest of the chlor-alkali industry to grant discounts to selected classes of users (as opposed to selective discounts secretly negotiated with individual buyers) only if it were necessary to prevent the loss of a substantial market for caustic soda, and then only to the extent necessary to prevent such a loss. Thus, in the months following P & G's approaches to chlor-alkali producers demanding a significant discount, coupled with a threat to convert its detergent manufacturing facilities to the use of soda ash instead of caustic soda if such a discount were not forthcoming, it was considered vital that the competitors exchange among each other information as to the technical and economic feasibility of P & G's threatened conversion, the probable impact on the entire caustic soda market of a discount to P & G and the precise nature and extent of any discount granted by one of them.

In furtherance of this understanding, before consummating its proposed contract with P & G, Fred Gilbert and Donald Oskin, FMC executives and first and second in command of its Inorganic Chemicals Department met with representatives of competing firms in Pittsburgh in June, 1958. There FMC revealed to its competitors the full terms of its offer to P & G, precisely detailing the discount to be accorded. This was done with the specific intent to minimize the impact of the proposed discount and to control its application by informing the

18. FX–57, Items 13A–B.

chlor-alkali industry of the limited nature of the discount. Under the prevailing marketing pattern of the chlor-alkali industry this was in effect informing all that it would be unnecessary, hence undesirable to grant a deeper or broader discount. This purpose was communicated to the competitors; it was an economic reality recognized by them, and acted upon by Columbia-Southern when it shortly thereafter proposed identical terms to P & G and captured its Cincinnati tonnage.

The Supreme Court has held that the attempted stabilization of prices as well as price-fixing is an unreasonable interference with the free play of the market and is unlawful *per se.* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). And, while there was no agreement proved to adhere to a price schedule as in *Socony-Vacuum, supra,* in the marketing of a fungible commodity such as caustic soda knowledge of a competitor's price meant matching that price. The language of the Supreme Court in the recently decided United States v. Container Corporation of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed. 2d 526 (1969) is instructive on this point. There the Court, Justice Douglas speaking for the majority, said:

> "Price information exchanged in some markets may have no effect on a truly competitive price. *But the corrugated container industry [and the chlor-alkali industry] is dominated by relatively few sellers.* The product is fungible and the competition for sales is price. The demand is inelastic as buyers place orders only for immediate short-run needs. *The exchange of price data tends toward price uniformity. For a lower price does not mean a larger share of the available business, but a sharing of the existing business at a lower return."* (Emphasis added.)

In that case the nature of the offense lay in the agreement to exchange most recent price quotations whenever requested by a competitor; here an agreement to exchange price information has also been inferred. While there were not the frequent recurring communications between competitors in this case as characterized the *Container* case, the difference can be attributed to the difference in marketing. However, in both cases the information was exchanged "when necessary" and with a purpose and effect to stabilize the market.

This continuing agreement to exchange all relevant information with respect to the pricing of caustic soda and to take common action on the information disclosed manifested itself again in the 1960 caustic soda discount to the Tyrex segment of the rayon industry.

The rayon industry is a large user of caustic soda. Thus, in the late 1950s, when nylon began making serious inroads into the use of rayon for automobile tire cord—which represented a substantial amount of total rayon sales—the chlor-alkali industry, together with other raw materials suppliers of Tyrex, came under pressure from Tyrex manufacturers to reduce its price for caustic soda used in such production, and as in the case of the P & G incident two years previously, the chlor-alkali industry could not afford the loss of a substantial market for its caustic soda. When Olin, the largest supplier of caustic to the rayon industry decided to grant a five per cent (5%) discount to rayon manufacturers limited to caustic used in the production of rayon tire cord, concurrently with the notification to its customers, it communicated this fact to its competitors at one of the informal meetings following the Advisory Committee sessions in New York City.[19] It was considered important that the industry know the amount of the discount and its limited scope lest other producers mistakenly respond to demands by their customers for similar discounts by according ones of even broader scope, thereby costing the industry a substantial

19. Finding 94.

amount of money. In making its disclosure, Olin was contemplating joint action on the part of all chlor-alkali producers; its competitors knew its intent when Olin, through John Logan, a vice-president, informed them of Olin's discount, and they responded in the manner contemplated by lowering their prices in the precise manner outlined by Logan. Both this incident and the previous meetings leading up to the discount offers to P&G reflect the joint conduct condemned by the Supreme Court in Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939) where the Court held that:

"Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."

Again, in Esco Corp. v. United States, 340 F.2d 1000 (9th Cir., 1965), the defendant argued that because of a lack of oral or written assurances, there was no proof of a conspiracy in a context wherein the defendant and its alleged coconspirators were present in a meeting in which one competitor announced its intent to take a specific pricing action. The Court held that:

"Written assurances * * * are unnecessary. So are oral assurances, if a course of conduct or a price schedule, once suggested or outlined by a competitor, in the presence of other competitors, is followed by all—generally and customarily—and continuously for all practical purposes, even though there be slight variations. (p. 1008)."

There was a purpose on the part of the chlor-alkali competitors to limit the amount of the discounts and they were limited to the extent proposed. Thus it can be said that the arrangement "materially interfered with the operation of the price mechanism of the market place" United States v. Container Corp., supra. Nor is it relevant that in realization of Logan's fear the discount gradu-

ally spread to the rest of the rayon industry. Successful as well as unsuccessful attempts to stabilize prices are prohibited by the Sherman Act. As the court noted in Socony-Vacuum, supra;

"[I]t is * * * well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. * * It is the 'contract, combination * * or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted action be wholly nascent or abortive on the one hand, or successful on the other." (310 U.S. 150, f. n. 59, at p. 224, 60 S. Ct. 811 at p. 845.).

And, absent the communication by Olin of the precise terms of its discount, the discount might have spread to other users immediately.

2. *The Conspiracy To Maintain Uniform Freight Arrangements.*

Like many other bulk commodities the chlor-alkali products are usually sold F. O.B. production point, with the customer paying the cost of freight to its plant. Because of the geographical distribution of the various producing points, those producers located nearest to potential customers enjoy a natural competitive advantage over producers located further away since the total delivered cost to customers (product plus freight) on an ordinary F.O.B. basis would be lower from the former locations. Therefore, to be able to compete effectively for customers outside their natural marketing areas producers must "equalize" freight costs by absorbing costs in excess of those charged from the producing point nearest to the customer so that their total delivered price is at least equal to that charged by the latter producer. Thus, each chlor-alkali producing plant making substantial merchant sales is considered an equalization point by its competitors for the purpose of quoting delivered prices to customers in its area (Finding 110).

Since, in the chlor-alkali industry the basic list prices of the products are uni-

form it is only necessary for the producer to know the freight costs from any equalization point to its customers' plants to be able to quote identical prices. When the means of delivery is by interstate carrier rail or motor—there is generally no problem in this regard since these tariff rates are required to be published. However, in the case of intra-state rates, which are not always required to be published, and in instances where the producers delivered their products to customers via their own vehicles, or negotiated individual rates with individual truckers, members of the industry were presented with problems because they were then unable to easily ascertain the appropriate freight costs to absorb in order to make their prices competitive with those of producers at the equalization points. On the evidence considered as a whole the conclusion is inescapable that FMC and its competitors named as co-conspirators in this action, throughout the period covered by the complaint, surmounted such problems by acting in concert so as to eliminate any disparities in the quotation of uniform prices, by exchanging information as to freight rates, including difficult to obtain intrastate freight rates; by agreeing not to recognize Linden, New Jersey as an equalization point; and agreeing upon the definition of quantities of caustic soda qualifying for shipment by barge.

These exchanges of information and the implied agreement underlying them were manifested in the meeting held at the St. Clair Inn, St. Clair, Michigan, in approximately 1955, or shortly after Hooker had begun the shipment of caustic soda by barge to large customers in the New York harbor area. There, Coey and Wilkin of Hooker explained the precise details of Hooker's practice to those present. They also discussed among themselves Hooker's definition of quantities qualifying for shipment by barge and reached an informal consensus that a 250 ton "lighter" should not qualify

for the special barge rate offered by competitors who met the new terms outlined by Hooker. While this meeting and exchange of information standing alone arguably could not be considered a violation of the Sherman Act, it reflected a continuing pattern of conduct evidencing the existence of an implied agreement to exchange freight rate information when necessary.

This continuing agreement was evidenced again in communications from the Traffic Department of Hooker to FMC's Traffic Department in November, 1957, informing FMC of Hooker's new rates to be effective January 2, 1958, for shipments of caustic soda by barge into the New York and Chicago area harbors.[20] There was also testimony by Donald Oskin of FMC that on unspecified occasions FMC through its traffic department exchanged unpublished trucking rates with its competitors, including individually negotiated rates.

Apart from the recurring exchanges of information with respect to freight rates the evidence also supports a finding that the non-recognition of Linden, New Jersey as an equalization point for chlorine and caustic soda was the result of an agreement between General Aniline and Film and the named co-conspirators, and between each other.

While individual informed business judgments by each competing producer could have concluded that GAF's Linden, New Jersey plant would not be a sufficiently competitive producer of chlorine and caustic soda to justify recognizing it as an equalization point for those products, had any of the major producers quoted an F.O.B. Linden rate, economic necessity and the price protection clauses of sales contracts would have required its competitors to meet its lower prices. Thus when Joseph Madden Sales Manager of GAF, informed each of his competitors that GAF would not quote an F.O.B. Linden price, but would instead recognize the existing equalization points of Edgewood, Maryland and Ni-

20. GX-78.

agara Falls, New York, informed each that others with whom he had spoken had also indicated that they would not recognize Linden, and in turn received assurances from each of them that they would not recognize Linden, these mutual exchanges of assurances of joint action constituted an illegal agreement in violation of the Sherman Antitrust Act. The conduct of these parties falls within the conduct condemned in Interstate Circuit, Inc. v. United States, *supra*, where the court found that:

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherance to the scheme and participated in it. Each distributor was advised that the others were also asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in restraint of commerce, which, we will presently point out, was unreasonable within the meaning of the Sherman Act, and knowing it, all participated in the plan." (306 U.S. at pp. 226, 227, 59 S.Ct. at p. 474.)

The court then held that:

> "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." (306 U.S. at p. 227, 59 S.Ct. at p. 474)

The defendant sought to rebut such an inference by arguing that Madden's purpose in meeting with each of his competitors was not to exchange assurances of joint conduct, but was done only for the purpose of informing them that since the Linden plant would be such a small competitive factor in the chlor-alkali market it would be unnecessary to equalize against it. But Madden's testimony on direct and cross-examination established that the size of the plant was a matter of public knowledge, and that it was a recognized fact that a plant the size of GAF's could not produce enough caustic soda and chlorine to satisfy the demands of a substantial number of buyers if it did choose to quote an F.O.B. Linden rate and its competitors did not respond by recognizing Linden.[21] Thus, it should have been unnecessary to communicate an obvious fact. What was important was for Madden to receive assurances that GAF's competitors would not recognize Linden, and for each of them to recognize that others likewise would not recognize Linden. The primary purpose then of Madden's meetings was to achieve a concert of action in the manner prohibited by *Interstate Circuit, supra*.

These exchanges of assurances continued after the initial non-recognition of Linden through the device of the post-Advisory Committee meetings where, according to testimony by John Coey of Hooker, those in attendance expressed to each other the view that Linden should not be recognized.

After the recognition of Linden as an equalization point for caustic soda in November, 1960, producers who formerly equalized against Allied's Syracuse, New York and Diamond's Edgewood, Maryland plants were uncertain as to which tank truck rate to quote for shipments into the New York area since under New Jersey law intra-state truckers were not required to publish their rates, and there were no uniform rate schedules. There was ample documentary evidence at trial showing communication between the chlor-alkali producers in which trucking rates were exchanged, and together with the testimony of Coey of Hooker and Madden, then of Stauffer Chemical Co., concerning meetings in 1960 to attempt to stabilize rates in northern New Jersey, adequately supports a finding that an understanding was reached between the producers to adopt the rates of the New

21. Madden, dir. 1370, cross 1392–93.

Jersey Tank Carriers Conference when quoting delivered prices to customers.[22]

Overt manifestations of the conspiracy charged with respect to the uniform freight arrangements were present also in the summer of 1960. In that year there was considered to be an instability in freight rates in northern New Jersey due to the use by some producers of unpublished rates. There was communication between some of the competitors by which attempts were made to determine what particular rates were being charged on shipments of caustic soda to certain locations in New Jersey. And in a meeting on July 20, 1960, at the Barclay Hotel in New York City called by Joseph Madden, Marketing Manager of Stauffer, representatives of several chloralkali producers, including FMC, Pennsalt, Wyandotte, Dow and Hooker met to discuss the general market situation in northern New Jersey, including the freight rates of intrastate truckers. At this meeting unpublished freight rates were exchanged among those present in order to allow them to be able to ascertain the lowest prices being quoted in the area and to enable each of them to determine whether their companies' delivered prices were "competitive" (read "equal") with those of other producers. It may have been at this meeting that the agreement to quote the published rates of the Tank Carriers Conference was entered into as there was a recollection by Coey of Hooker that one of his subordinates who was present at the meeting reported that those present selected a rate to quote in future negotiations, "arbitrarily".

The above-cited situations explained in more detail in the findings reflected clear attempts by FMC and its competitors to act in concert and, apart from constituting further examples of a continuing agreement to exchange the information necessary to quote identical prices, the implied agreement not to recognize Linden, New Jersey and the agreement to adopt a single tank truck rate in New Jersey constituted *per se* violations of the Sherman Act. Interstate Circuit v. United States, *supra*.

In United States v. Socony-Vacuum, *supra*, the court said:

"Any combination which tampers with price structures is engaged in unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." (310 U.S. at p. 221, 60 S.Ct. at p. 843).

Here, the result of the recurring communications and agreements between the competitors facilitated the quotation of identical prices by eliminating any uncertainties or disparities in practice which might tend to detract from this goal.

It is not relevant that there is no evidence to link FMC to every facet of the conspiracy; nor can FMC successfully argue that it is not bound by acts done pursuant to conspiracy before the evidence established its participation.[23] The conspiracy was reflected in a *continuing* agreement, and as such renders FMC liable for all acts done pursuant to the agreement. Esco Corporation v. United States, *supra*, 340 F.2d p. 1006; Morton Salt Co. v. United States, *supra*, 235 F.2d p. 580.

### D. CONCLUSION

In making a proper determination of whether the Government had met its burden of proving the allegations of its complaint the court was required to steer a careful course between the Scylla of a too rigid proscription of any contracts

---

22. Coey, dir. 1052-54; Madden, dir. 1376-83; cross 1400-06. GX-60, GX-61, GX-62, GX-64, GX-65, GX-67, GX-69, GX-70, GX-73, GX-90, GX-91.

23. There is no evidence that FMC was represented at the 1954 meeting at the St. Clair Inn.

or communication between men engaged in the same line of business and the Charybdis of sanctioning a market practice which completely substitutes agreements and concerted actions on the part of competitors for the independent conduct of business by individual corporations. For this reason the court was unable to sustain the Government's broad allegation of a "community of thought" which permeated every aspect of the marketing of chlor-alkali products, rendering competition nugatory. There was ample evidence in the record to establish that there was not a total absence of competition in the industry. Evidence of widespread but secretly negotiated discounts to individual buyers; competitive innovations in marketing which enhanced a producer's share of the market at the expense of other producers, such as FMC's development of a more versatile grade of soda ash; the refusal by some producers to follow list prices announced by their competitors, and the gradual extension of initially restricted price discounts to broader segments of the market, demonstrated a disposition on the part of the chlor-alkali producers to aggressively seek to capture a larger share of the chlor-alkali market. Nonetheless, there was also a disposition on their parts to avoid the pitfalls of market fluctuations caused by a lack of knowledge of relevant marketing information on any of their parts. They resolved to avoid this by consistently communicating to one another all material details of significant deviations from the prevailing marketing practices which any of them made. Yet, the defendant has been found to have violated the Sherman Act not merely because of its exchanges of information in a manner and with an effect proscribed by the Supreme Court in United States v. Container Corporation of America, *supra*. For FMC and its competitors did more than exchange information with one another under an implied agreement to supply information whenever requested, and use the information obtained to stabilize the market. The record of this case disclosed instances of direct assurances, as well as implied assurances and agreements, that "the disposition of men 'to follow their most intelligent competitors' " [24] would be reinforced by a concert of action, in which all would willingly participate, to restrain the normal competition and fluctuations of the market place.

## IV.

### CONCLUSIONS OF LAW

1. The court has jurisdiction over the defendant and the subject matter of this action.

■ 2. The evidence in this case does not prove or support an inference that FMC combined and conspired with others to increase chlorine prices in 1955, 1956 and 1960.

■ 3. The evidence in this case does not prove or support an inference that FMC combined and conspired with others to increase liquid and dry caustic soda list prices in 1955 and 1956.

■ 4. The evidence in this case does not prove or support an inference that FMC combined and conspired with others to increase soda ash list prices in 1955 and 1956.

■ 5. The evidence in this case does not prove or support an inference that FMC combined and conspired with others to increase dry caustic soda list prices in 1958.

■ 6. During the period covered by the complaint FMC combined and conspired with others to stabilize and maintain the price level of liquid caustic

24. American Column & Lumber Co. v. United States, 257 U.S. 377, 399, 42 S.Ct. 114, 117, 66 L.Ed. 284 (1921).

soda by exchanging information pursuant to a common understanding, and by acting in concert so as to limit the application of discounts off the list price of caustic soda to classes of users.

7. During the period covered by the complaint, FMC combined and conspired with other chlor-alkali producers to exchange all relevant freight rate information and to eliminate any disparities in the practice of quoting freight rates which might have detracted from their ability to sell chlor-alkali products at identical prices.

8. From the period of approximately 1956 through 1960 FMC and other chlor-alkali producers combined and conspired not to recognize Linden, New Jersey as an equalization point for caustic soda and chlorine.

9. The evidence in this case supports an inference that the meetings and discussions among FMC and its competitors and the recurrent exchanges of information with respect to price changes and freight rate practices and the adoption of business practices in conformance with the information exchanged had the concerted purpose and effect of restraining interstate commerce in caustic soda in violation of Section 1 of the Sherman Antitrust Act.

10. In combining and conspiring with others as described in Conclusions 6 through 9 above, FMC has engaged in a continuing agreement, understanding and concert of action with others to eliminate price competition in the sale of chlor-alkali products.

11. The continuing agreement, understanding and concert of action described in Conclusion No. 10 above, constitutes an unreasonable restraint of interstate trade and commerce in chlor-alkali products in violation of Section 1 of the Sherman Act.

12. The plaintiff is entitled to injunctive relief.